**DIXIE OHIO EXPRESS CO. et al. v. POSTON.**

**DIXIE OHIO EXPRESS CO. et al. v. WEATHERS.**

No. 12332.

United States Court of Appeals
Fifth Circuit.

Nov. 3, 1948.

A. Walton Nall, of Atlanta, Ga., for appellants.

Frank M. Gleason, of Rossville, Ga., for appellees.

Before HUTCHESON, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Mrs. Ida Poston sued W. E. Killian, L. E. Revels, Dixie Ohio Express Company, and American Fidelity and Casualty Company for damages for the death of her husband which occurred when the car which he was driving ran into the rear of a truck parked on the highway.

J. W. Weathers, a passenger in the car with Poston, sued the same defendants to recover for injuries which he sustained in the same accident. The two cases, involving the same facts as to negligence, were consolidated for trial.

Dixie Ohio Express Company was the holder of a Certificate of Convenience and Necessity, issued by the Georgia Public Service Commission, as a common carrier of goods by motor vehicle. American Fidelity and Casualty Company was the insurance carrier for the Express Company as required under the Georgia law.

The hauling part of the business of the Express Company was carried on under a contract with the defendant, Killian, who owned, and furnished, the motor vehicles for such transportation, and who received the larger portion of the profits. Defendant Revels, who was paid by Killian, was the driver of one of the Killian truck-trailers and, at the time of the accident, was making a trip in furtherance of the business of the joint enterprise, which enterprise will sometimes be referred to as the "motor carrier".

On the night of February 14, 1947, between 7:30 and 8 o'clock, Mr. Weathers and a young woman were riding in an automobile belonging to, and driven by, Mr. Poston, on a public highway in Georgia when they collided with the rear end of a truck-trailer owned by Killian, driven by Revels, and operated under the Certificate of Convenience and Necessity of Dixie Ohio Express Company. The driver had stopped the truck-trailer upon the highway upon finding it blocked by another truck and, at the request of the other driver, was engaged in trying to tow or push the stalled truck back upon the highway, when the car driven by Poston ran into, and under the rear of the truck-trailer. The collision occurred, according to the testimony, within five to ten minutes from the time the Killian truck had been forced to stop by reason of the blocking of the road by the other truck. Revels, thinking his stop would be for only a short duration, put out no flares on the highway. In the collision Mr. Poston was killed and Mr. Weathers was injured.

The allegations of negligence are, in substance: (1) that Revels stopped the truck within eight feet of the center line of the highway in violation of the Georgia law; (2) that after stopping the truck, Revels also violated the rules of the Georgia Public Service Commission in failing to put out flares; (3) that Killian and the Dixie Ohio Express Company failed to equip the trailer-truck with red clearance, tail, and stop *lamps* and reflectors, as required by the law of Georgia; and (4) that the defendants failed to display clearance and tail *lights*

and reflectors at the time of the accident. With the exception of the failure to equip the trailer truck with lamps required by the laws of Georgia, the other grounds of negligence were predicated upon the negligence of Revels, the driver of the truck, who was alleged to be the servant of both the carrier and Killian, to both of whom his negligence was imputable.

The jury returned the following verdicts: "We, the jury, find for the plaintiff, Mrs. Ida Poston, against the Dixie Ohio Express Co., Inc., and the American Fidelity and Casualty Co., Inc., the sum of ($15,-000.00) fifteen thousand dollars damage." "We, the jury, find for the plaintiff, J. W. Weathers, against the Dixie-Ohio Express Co., Inc., and the American Fidelity & Casualty Co., Inc., the sum of ($5,000.00) five thousand dollars damage."

It will be noted that the jury said nothing whatsoever as to whether it found in favor of or against the truck driver, and this feature of the jury's verdict is of much significance in these cases. The lower Court, however, construed the verdict to be a finding in favor of the individual defendants, Killian and Revels, and entered like judgments to that effect in each case.[1]

Precedent for the action of the trial Court in entering such judgments is found in Southern Railway Company v. Nix, 62 Ga.App. 119, 8 S.E.2d 409, wherein the plaintiff brought a joint action against the Railway Company, Will West and John Mann, the engineer and fireman, respectively, to recover damages for the death of her husband, in the trial of which the jury returned a verdict solely against the Railway Company without mention of the other defendants. Of such verdict the Court said:

"The trial resulted in a verdict for the plaintiff against the company alone, which, in effect, was a finding that the engineer and fireman were not liable."

In accord with the holding of the Court of Appeals in the Nix case, we deem the failure of the jury in the present case to find against the driver and the other individuals to be a verdict exonerating and acquitting them from the charges of negligence. But in so concluding, we are then confronted with a rule which—the Appellees admit—is well established in Georgia, that in a joint action against the master and his servant for the recovery of damages alleged to have been inflicted solely in consequence of the servant's negligence, a verdict finding solely against the master and that the servant was not liable is "unauthorized", "repugnant", or "self-contradictory", and should be set aside and a new trial granted. See: Southern Railway v. Nix, supra (wherein it was held that such a verdict was "unauthorized, and must be set aside."); Kalil v. Spivey, 70 Ga.App. 84, 27 S.E.2d 475 (wherein it was held that such a verdict was "repugnant" and also that such a verdict was "void".); Southern Railway Company v. Harbin, 135 Ga. 122, 68 S.E. 1103, 30 L.R.A.,N.S., 404, 21 Ann.Cas. 1011 (quoting with approval McGinnis v. Railroad Company, 200 Mo. 347, 98 S.W. 590, 9 L.R.A.,N.S., 880, 118 Am.St.Rep. 661, 9 Ann.Cas. 656, wherein such a verdict was called a "monstrosity", and, in quoting from Montford v. Hughes, 3 E.D.Smith, N.Y., 591, that such a verdict was "self-contradictory.").

Numerous Georgia cases conclusively establish the rule in Georgia that where the master was not and could not have been guilty of negligence except through the acts of its servant on the principle of respondeat superior, no liability could be imputed to the master where its servant was exonerated when he alone performed the act which constitutes the basis of the charge for negligence. See Southern Railway Co. v. Harbin, supra; Kalil v.

[1] "A jury in the above stated case having found a verdict in favor of the plaintiff against the defendant, Dixie Ohio Express Company and defendant American Fidelity and Casualty Company, and not having found against the defendant W. E. Killian and defendant, L. E. Revels, the effect of which was a finding in favor of the said defendants, W. E. Killian and L. E. Revels, judgment is hereby rendered in said case in favor of W. E. Killian and L. E. Revels, and the Clerk of said Court is hereby directed to enter judgment on the dockets in their favor accordingly."

Spivey, supra; Southern Ry. Co. v. Nix, supra; Southern Ry. Co. v. Davenport, 39 Ga.App. 645, 148 S.E. 171; Salmon v. Southern Ry. Co., 137 Ga. 636, 73 S.E. 1062; Roadway Express Co., Inc. v. McBroom, 61 Ga.App. 223, 6 S.E.2d 460. The following Federal cases also support the rule: King v. Stuart Motor Company, D.C.N.D. Ga., 52 F.Supp. 727; Portland Gold Mining Company v. Stratton's Independence, 8 Cir., 158 F. 63, 16 L.R.A.,N.S., 677. Indeed, the brief of the Appellees seems to concede the existence of this rule.[2] Appellees contend, however, that this principle has no application except in cases where the liability of the master is based solely on the wrongful acts of the acquitted servant. We think that this contention is right, for in Southern Railway Company v. Harbin, supra—the leading case in Georgia—, the Court, in sustaining the principle, clearly indicated that the principle would not include a master who was also guilty of negligence independently of that of the servant.

So here Appellees insist that the evidence shows that the motor carrier was guilty of negligence independently of that of the driver of the truck-trailer, by reason of which it would not be released by the exoneration of the driver. In short, they insist that the rule is not applicable to the case of joint tort feasors where the master is guilty of negligence that is independent of, and not derived from, the servant—the other alleged tort feasor.

Under Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we must give adherence to any rule that is so well established by the Georgia courts, and we, therefore, hold that in the circumstances here where the alleged negligence of the master was derived from the servant, the master cannot be held liable for such negligence of which the servant was found not guilty, but that the rule does not extend to situations wherein the master was guilty of negligence not committed by, or through, its acquitted agent.

In order to apply these principles to the cases at hand, we must sift the allegations and the evidence in order to ascertain whether or not there are any allegations and proof of negligence on the part of the convicted defendant not derived or imputable from the negligent acts of the acquitted driver, Revels.

We are of the view that the following alleged acts of negligence on the part of the driver could be imputed to the motor carrier only in virtue of the relation existing between it and Revels and on the theory of respondeat superior: (1) the failure to put out flares; (2) the parking of the trailer truck too near the center of the highway; (3) any failure to display, or to have lighted, the clearance lights, tail lights, and stop lights and reflectors at the time of the accident; (4) any negligent operation of the truck-trailer under the circumstances, and that a verdict finding the driver free of negligence in any of the foregoing particulars would necessitate a finding also that the master was not liable for any of these acts of derivative negligence.

This conclusion, however, does not free us from further consideration of these cases because of the contention that there was evidence to support the allegations that the defendants, Dixie Ohio Express Company and Killian, failed to equip the truck-trailer with red clearance lamps, tail and stop lamps, and reflectors as required by the law of Georgia. The answer to this question requires a close examination of the evidence.

There was some rather negative testimony by the plaintiff, Weathers, that no *lamps* were *lighted* on the rear of the truck. There was also an unsuccessful effort by plaintiffs to show that the wiring or switches supplied by the master were defective. If, therefore, any of the rear lamps on the truck-trailer were not burning at the time of the accident, any omission to turn on the lights can only be attributed to the dereliction of the driver rather than to defects in the equipment furnished by the master.

[2] "The rule for which the defendants contend, to-wit: that where the complaint is based *solely* upon the negligence of the agent, and the evidence shows this to be the only negligence involved in the case, the principal can be held liable only if the agent is also held liable, is acknowledged." (Italics added.)

The only other charge of negligence of the master—independent of, or non-derivative from, the driver—was the failure to equip the vehicle with red clearance tail and stop lamps and reflectors.

In considering the allegations and the evidence we must keep clearly in mind the distinction between "lamps" and "lights" and remember that lights are the product of illumined lamps. The regulations of the Georgia Public Service Commission clearly reveal this distinction. Indeed, so do the allegations of the complaint. It is not alleged that the defendants failed to equip the truck-trailer with tail *lights,* etc., but with tail *lamps,* and also that these tail *lamps* were not *lighted* or displayed.

The testimony of plaintiff Weathers was wholly negative as to the absence of tail *lamps,* etc., but merely that the lamps were not lighted, or that they did not "show up". His testimony in this respect—in which he stands alone and in contradiction to the positive testimony of all other eye witnesses— is so negative in character as to require a critical examination thereof. All the other witnesses who saw the accident or who were present at the time of the accident testified that the clearance lights, tail and stop lights, were burning, and that the vehicle was equipped with reflectors. One other witness, a road patrolman who arrived at the scene two or more hours after the accident, and after the vehicles had been moved from the highway, on direct examination gave testimony as to the absence of certain lamps on the rear of the truck-trailer—much of which he retracted when on cross-examination he was shown photographs of the rear of the truck. In view of the closeness of the question as to the substance of the testimony of these two witnesses, we deem it of value to detail their testimony and to undertake to discern whether or not there was substantial evidence in the case upon which the jury could have found that the master was guilty of independent negligence, or of negligence not derivative from the driver, in failing to equip the truck with lights and signals in the manner required by the Georgia law. All of the testimony of the plaintiff, Weathers, on the subject is as follows (R. 73):

"Q. Now, as you approached this truck, did you see any lights, or flares, or fuses on that highway? A. No, sir, not a one.

"Q. Was there any? A. No, sir."

(This testimony could have reference only to flares or warning lights set out *on the highway* and not to lights, flares, or fuses *on the truck.)*
(R. 105)

"Q. But you didn't see the lights on the truck either? A. Not on that truck that we hit, no, sir.

"Q. You don't know whether there was any lights on it or not? All you know, you didn't see any? A. I didn't see no lights. There wasn't no lights to be showed up.

"Q. Well, you didn't see any lights, did you? A. No, sir.

"Q. Are you prepared to testify there were no lights on that truck at the time you approached it, and coming over the crown of that hill? A. All I can swear that I didn't see none.

"Q. All you are willing to swear is that you didn't see any. That's right, isn't it? A. I didn's see no lights at all on it."
(R. 110)

"Q. Now, Mr. Weathers, if there had been a light on that truck, would you have seen it? A. Well, if there's been a light on and it showed up, we would have seen it."

"Q. Was there any light on the back of that truck? A. No, sir."

He gave no testimony as to the absence of tail lamps and it will also be observed that Mr. Weathers' testimony at first was to the effect that he did not see any *lights* on the truck, but at page 105 of the record he stated that all he could swear was that "I didn't see none." This part of the testimony is negative in character and under the Georgia statute [3] must give way in

---

[3] Title 38, Sec. 111, Code of Ga. Annotated, provides:

"The existence of a fact testified to by one positive witness is to be believed, rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know of its having existed. This rule shall not apply when, two parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not."

the face of the positive testimony of several of the witnesses that the lights on the rear of the truck were burning. It will not be overlooked, however, that on page 110 of the transcript Mr. Weathers testified: "Well, if there's been a *light* on and it showed up, we would have seen it," and further on the same page, when asked if there was any *light* on the back of the truck, answered, "No, sir." (Emphasis added.)

The substantiality of plaintiff Weathers' testimony must be considerably depreciated in the light of his testimony on page 74 of the transcript:

"Q. Now, when did you first see this truck stopped in the road? A. Well, I just got the glimpse of it, as we hit it.

"Q. Now, can you give the jury any idea, Mr. Weathers, how long it was from the time you first saw the truck until the time the collision occurred? A. About, I wouldn't any more than say we hit, went under. I didn't any more than see it until we hit, went under."

He also testified that both his legs, his right arm, and his jaw bone were broken—the latter in three places—, his skull fractured, and his throat cut twice, and that he did not retain consciousness for a time. This witness' testimony was not as to the non-existence of *lamps* on the back of the truck but as to the failure of the lamps to be *lighted,* or the absence of lights, and it cannot be rightly asserted that he knew, or had the adequate opportunity to learn, whether there was a failure to equip the truck with lamps or that he was undertaking to testify to the existence or non-existence of the lamps as distinguished from lights. This is made quite clear by his answer that "Well, if there's been a light on *and it showed up,* we would have seen it." In other words, he did not testify that there were no lamps on the truck but merely that they did not show up or that if they did, he failed to see them. But as stated heretofore, the failure to equip the truck with lamps would have been negligence of the master independent of the servant, but the failure to turn on the lights and to have them burning under the facts in this case would have been the negligence of the driver.

The only other witness who gave any testimony tending to support the plaintiff's allegation of the absence of lamps was Road Patrolman W. H. Tipton. His testimony on the subject was (R. 163):

"Q. What kind of lights did this truck have on it? A. His clearance lights were burning, and his headlights, that is on the top of the trailer.

"Q. Would the other lights burn? A. There wasn't a rear light on the back, what is known as a tail light, there wasn't a tail light on.

"Q. There was no tail light on the back of the truck? A. There was not.

"Q. Did you turn the switch on in that truck? A. I did.

"Q. Did the same switch that operated the headlights operate the other lights? A. Does not.

"Q. Now just how are the lights on the rear of that trailer turned on and off, just explain that to the jury.

"Q. Let's get them defined. A. All right, sir.

"Q. Where is the clearance light on a truck? A. That is the light on the extreme corners of the truck, at the top.

"Q. One on each corner? A. That's right.

"Q. Those are referred to as clearance lights? A. That's right.

"Q. Now, what are the other lights referred to? A. The other lights are the lights that is on the bottom, rear of the truck, trailer.

"Q. Now, by using that diagram (in Georgia Public Service Rule book), Mr. Tipton, please state how the truck involved in this accident differed from that in the lighting arrangement on the rear end. A. This truck has a red clearance lamp, this is on top.

"Q. Yes, sir. A. That truck had the same. This truck has a tail lamp, stop lamp, and red reflectors. The truck that was involved in the accident did not have any of those down here.

"Q. Now, I show you plaintiffs' exhibit #5 which you have heretofore identified, and I will ask you to examine that photograph and state whether or not a light, a

stop light, a reflector, or a tail light, appears on that photograph, and if it does, was it working. A. There wasn't a stop light or tail light on the rear of the truck.

"Q. What was it? A. There is a little glass over here on each corner, of course, one of them was broken, there was one on the right side that wasn't broken, but there wasn't a tail light or stop light on it, when I arrived at the scene."

On cross examination the witness, after being shown photographs of the rear of the truck, admitted that the truck did have red glass reflectors on the bottom corners of the rear of the truck. He also then gave the following testimony (R. 166-167):

"Q. And the car had come under the truck, and so far as you know the tail light could very well have been knocked off in the accident, as a result of the automobile coming under the back of the trailer? A. It could have.

"Q. As a matter of fact, from looking at the number and all, and the wheels knocked out from under it, you would say that it would be difficult for a tail light and stop light to stay on there with an automobile going under there, wouldn't you? A. It would be unless it was behind a brace there with poles.

"Q. Well, if it was behind a brace it would be crushed up against it, you wouldn't expect to find one there after an accident under those circumstances, would you, where an automobile had run under it hard enough, and with enough force to knock the wheels in kitty-cornered position under that trailer? A. You wouldn't expect to find one out in the open.

"Q. You are not saying, and your testimony does not mean to imply that there was no stop light or tail light on that truck when the accident happened, does it? A. No, sir."

From this testimony it is evident that he was giving his recollection of the condition of the truck as he believed that he saw it

two or more hours after the accident, and after the automobile had run under the rear of the truck in such fashion that it could have destroyed the tail light, rather than the condition at and before the accident. It is evident that when this witness was confronted with the photographs of the truck in its condition after the accident, which seems clearly to reveal the presence of a tail light, the witness' testimony on the subject was changed to the point that it lacked sufficient substantiality to support a case for the jury as to the absence of a stop or tail lamp at the time of the accident.

■ We are thus brought to the conclusion that there was no substantial evidence to sustain the verdict of the jury against the Dixie Ohio Express Company for the alleged failure properly to equip the truck. This conclusion, together with the decisions of the Georgia Courts that the master cannot be held liable for the derivative negligence of his servant unless the servant is found guilty of negligence in and about the master's business, necessitates a reversal of the judgments.

The failure of the jury to find that the driver was guilty of actionable negligence and the effect thereof on the master was duly called to the attention of the Court by Appellant. No effort was made to have the verdict clarified or completed in the lower Court and it, deeming the verdict to have the effect of a finding in favor of the driver and the other individual defendants, entered judgment accordingly. Whether the verdict should be characterized as either nugatory, incomplete, self-contradictory, or repugnant, or as all of these, it seems that the verdicts should be set aside, the judgments reversed, and new trials ordered. Southern Railway Co. v. Nix, supra, and Southern Railway Company v. Harbin, supra.

It is so ordered and the causes are remanded for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.