H. Anita LINCOLN, Plaintiff-Appellee, Cross-Appellant,

v.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, and Clyde W. Hall and Evanel R. Terrell, Defendants-Appellants, Cross-Appellees.

No. 81–7297.

United States Court of Appeals, Eleventh Circuit.

Feb. 10, 1983.

Rehearing and Rehearing En Banc Denied April 25, 1983.

Arthur K. Bolton, Atty. Gen. of Ga., Alfred L. Evans, Jr., Sr. Asst. Atty. Gen., Atlanta, Ga., for defendants-appellants, cross-appellees.

John J. Sullivan, Gilbert L. Stacy, Savannah, Ga., for plaintiff-appellee, cross-appellant.

Before RONEY and HATCHETT, Circuit Judges, and WISDOM *, Senior Circuit Judge.

WISDOM, Senior Circuit Judge:

The Board of Regents of the University System of Georgia appeals from a judgment for Dr. Anita Lincoln on her employment discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. From 1974 through 1978, Dr. Lincoln was employed under four separate one-year contracts as a nontenured professor of home economics at Savannah State College, a state school subject to the oversight of the Board of Regents. When her contract was not renewed in 1978, she brought this action in the United States District Court for the Southern District of Georgia, alleging that the decision not to offer her a fifth contract was racially motivated. Dr. Lincoln is white, and Savannah State is an integrated, but historically and predominantly black, institution.

Dr. Lincoln's complaint sought reinstatement and back pay under Title VII and compensatory and punitive damages under the Civil Rights Act of 1866, 42 U.S.C. § 1981. It named as defendants the Board of Regents and two members of the Savannah State faculty, Mrs. Evanel Terrell and Dr. Clyde W. Hall.[1] Mrs. Terrell was head of the home economics department during Dr. Lincoln's first two years at Savannah State. Dr. Hall was head of the technical sciences division, which includes the home economics department, during most of Dr. Lincoln's term of employment and was acting president of the college in 1978, when Dr. Lincoln was not offered a new contract. Both Mrs. Terrell and Dr. Hall are black.

Before the case went to trial, the district court dismissed the § 1981 claim against the Board of Regents, on the ground of sovereign immunity. It also dismissed the Title VII claim against the individual defendants, on the ground that they were not "employers" within the meaning of the statute. The court empaneled a jury to decide the § 1981 claim against Mrs. Terrell and Dr. Hall and instructed it to return an advisory verdict on the Title VII claim against the Board.[2] The jury returned a verdict for the individual defendants, and the district court entered judgment accordingly. In its advisory verdict, however, the jury recommended judgment for the plaintiff against the Board. The district court entered its own findings of fact and conclusions of law, granting judgment in accord with the advisory verdict. The court awarded Dr. Lincoln back pay and attorney fees and ordered the Board of Regents to purge its records of all references to the events leading to Dr. Lincoln's departure.[3]

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The complaint also named Ms. Diana Wagner, a black member of the home economics faculty, as an individual defendant. The claim against Ms. Wagner was voluntarily dismissed before the trial.

2. The seventh amendment requires a jury trial in an action for damages under § 1981 but not in an action for reinstatement and backpay under Title VII. See p. 8. Before trial, the district court denied a motion by the Board of Regents for separate trials.

3. The court found reinstatement impracticable in view of the small size of the home economics department and the severe friction that had developed between its members and Dr. Lincoln in connection with the events giving rise to this lawsuit. No question concerning remedies is before us on this appeal.

The Board brought this appeal, contending that the district court's judgment against it violated the seventh amendment, because it was premised on the theory of *respondeat superior* and was therefore inconsistent with the facts as found by the jury in exonerating the individual defendants, the Board's agents. The Board also contends that the district court's findings were clearly erroneous. Dr. Lincoln filed a cross-appeal, urging that the jury's verdict on the § 1981 claim was inconsistent with its advisory verdict on the Title VII claim and must be set aside. We reject all the arguments of the appellant and the cross-appellant and affirm the judgment of the district court.

## I. Factual Background

Our review of the district court's decision in this case is best understood against a background that goes back to the beginning of Dr. Lincoln's career at Savannah State. Her career was marked throughout by personal friction, particularly with Mrs. Terrell, and by complaints of students and some other faculty members. Neither the friction nor the complaints can be attributed entirely to Dr. Lincoln's professional deficiencies or to racial bias. Her history at Savannah State seems to establish only that elements of both were present.

When Dr. Lincoln arrived at Savannah State College under a one-year contract in the fall of 1974, she was in her middle fifties and had an extensive background in home economics, specifically dietetics. She had several degrees, including a Ph.D., and considerable experience in governmental and administrative work germane to her area of expertise. Her familiarity with certain practical and elementary aspects of her subject, however, particularly those associated with introductory courses and laboratory instruction, was limited. At the time of her arrival, her supervisors were Mrs. Terrell and Dr. Hall. Dr. Hall had been head of the division of technical sciences since 1961. He served in that position until 1976 and again from 1977 until March 1978. He was acting president of Savannah State

from that time until 1980. Mrs. Terrell had been head of the home economics department since 1947. Both Mrs. Terrell and Dr. Hall recommended Dr. Lincoln's appointment in 1974 and knew at the time that she was white.

It was not long before Dr. Lincoln encountered problems with both students and faculty. Friction developed between her and Mrs. Terrell in particular. Mrs. Terrell, and Dr. Hall as well, viewed themselves as supervisors, while Dr. Lincoln was accustomed to considerable professional independence. Mrs. Terrell found Dr. Lincoln insubordinate in several instances, particularly when she moved a class without consulting Mrs. Terrell and when she failed to file a required inventory. As our discussion in Part III will elaborate, there was evidence, and the district court found, that Mrs. Terrell's reactions to any insubordination on Dr. Lincoln's part were exacerbated by racial bias.

Mrs. Terrell soon began complaining to Dr. Hall about Dr. Lincoln. Dr. Hall was not convinced that Dr. Lincoln was incapable, however, and he offered her a second contract for the 1975–76 term. The problems between Dr. Lincoln and Mrs. Terrell continued, and in October 1975, Mrs. Terrell wrote to Dr. Hall concerning alleged inadequacies in Dr. Lincoln's performance. Dr. Hall held a conference with Dr. Lincoln and Mrs. Terrell, and Dr. Lincoln said that she had neither interest nor ability in teaching laboratory work but that she would try to improve.

Mrs. Terrell wrote to Dr. Hall again in January 1976, recommending that Dr. Lincoln not be offered a new contract. She wrote a third letter in May of that year, recommending dismissal, and at this time, students as well had begun to complain of Dr. Lincoln's inadequacies. Dr. Hall nevertheless remained cautious, hoping the situation would improve. He offered Dr. Lincoln a contract for the 1976–77 term but wrote her that the department had been "badly disappointed" with her performance and that he expected a "tremendous improvement" as a condition to reappoint-

ment. A second conference took place during the summer, at which Dr. Lincoln again promised to improve. In the fall of 1976, student complaints continued, and Dr. Hall visited several of Dr. Lincoln's classes to investigate her performance. As he testified at trial, he observed several serious deficiencies but took no immediate action.

In February 1977, several students in the home economics department signed a petition calling for Dr. Lincoln's removal. The petition bore 37 signatures and asserted numerous serious inadequacies on Dr. Lincoln's part. The allegations centered on delinquency in teaching methods,[4] a smell of alcohol on Dr. Lincoln's person, and absenteeism and lateness. One allegation also concerned Dr. Lincoln's insubordination toward Mrs. Terrell.[5] The district court, relying on evidence we will discuss in Part III, found that the "direct and clear appeal of the petition is racial" and that Mrs. Terrell, who had retired the previous summer, and perhaps other faculty members as well, had played some role in originating it. Dr. Hall later discovered that the petition had been typed in his office on college stationery.

Apparently prompted by the petition, Dr. Hall suspended Dr. Lincoln from teaching duties on February 18, 1977. He stated, however, that he was still trying to keep the situation under control. On February 24, he held a meeting with Dr. Lincoln, Dr. Teresa Anthony, a white faculty member who was acting as department head following Mrs. Terrell's retirement, and Dr. Thomas Byers, Dean of the College and Dr. Hall's immediate supervisor. Only specific charges concerning Dr. Lincoln's performance as a teacher were discussed, as Dr. Hall considered racial charges an inappropriate basis for action. Dean Byers also held a meeting with Dr. Lincoln and students, in an ineffective effort to "restore confidence".

On March 10, 1977, Dr. Anthony wrote to Dr. Hall, recommending "immediate termination" of Dr. Lincoln, based on "incompetency and lack of accountability". Dr. Hall still felt that the situation could be improved without such drastic action. He asked Dr. Anthony to withdraw her suggestion, but she refused. Her letter then became the basis for formal action.

After attempts at mediation failed, a faculty committee was appointed to review student charges. The committee consisted of Ms. Diana Wagner, a black assistant professor of home economics, and two faculty members from unrelated disciplines, Dr. Luetta Millege and Mrs. Gaye Hewitt. The committee heard testimony from Dr. Anthony and nine students and, in a letter to the president of the college, recommended that Dr. Lincoln be suspended for the remainder of the term and offered no renewal or, alternatively, that she be dismissed immediately. The president, Dr. Prince Jackson, then notified Dr. Lincoln that she was being terminated immediately, although, as he testified, he considered the case against her "weak".

Dr. Lincoln appealed her termination, and a second faculty committee reviewed her appeal. After interviewing students and faculty, the committee found her incompetent, although a minority report questioned the sufficiency of the evidence. The committee also criticized unnamed faculty members for their exploitation of student unrest and their involvement in the petition for Dr. Lincoln's removal. The committee recommended that Dr. Lincoln be given temporary employment, to allow her an opportunity to resign. Shortly after the committee made its recommendations, Dr. Hall wrote to President Jackson, urging that

---

4. More specifically, the petition alleged that Dr. Lincoln failed to order books and other materials, failed to return projects with proper evaluations, held laboratories without adequate lecture preparation, inadequately prepared for classes, lost examination papers, gave unwarranted high grades to offset inadequacy in instruction, and dressed improperly for laboratories.

5. The incident referred to in the petition concerned a letter from Dr. Lincoln to Dr. Hall stating that Mrs. Terrell had misinformed her students about certain requirements for internships.

"the integrity of this institution would be threatened" if Dr. Lincoln were retained.

Before acting on the committee's recommendation, President Jackson decided to investigate on his own the circumstances surrounding the student petition. He found that faculty members not only had been involved but had exerted unfair pressure on students to sign. He concluded that Dr. Lincoln had been treated unfairly and did not believe her incompetent. He therefore offered her a new contract for the 1977–78 term. Dr. Lincoln was given a new position, however, which involved no teaching. She was assigned to the Dean's office, with responsibility for updating the faculty handbook and securing government grants. President Jackson informed Dr. Lincoln that he would review her status at the end of the 1977–78 school year. At that time she would be retained only if she generated sufficient outside funding to pay her own salary.

When the time for review arrived, Dr. Hall had taken over as acting president, but President Jackson had left him instructions concerning review of Dr. Lincoln's position. Accordingly, Dr. Hall asked Dr. Lincoln to submit an accounting of her work for the 1977–78 term. Dr. Lincoln did not comply with the request, apparently because she felt that in view of Dr. Hall's opinion that she was a threat to the integrity of the college, it was unlikely that he would consider her favorably. Dr. Lincoln did not apply for a new contract, and Dr. Hall, upon receiving no response to his request for an accounting, decided not to offer her one. The district court found that "even had Dr. Lincoln complied with Dr. Hall's request, she would not have been continued", because "there is no reason to believe that [she] had generated . . . funding in the requisite amounts".

## II. The Seventh Amendment

We consider first the Board's argument that the judgment against it violated the seventh amendment. That amendment provides, in pertinent part, that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States,

than according to the rules of the common law". The Board of Regents argues that the judgment against it rests on an impermissible re-examination of facts found by the jury in the § 1981 action against Mrs. Terrell and Dr. Hall. According to the Board, the judgment on the Title VII claim was predicated on the theory of *respondeat superior* and on illegal discrimination by the individual defendants as its agents. Because the jury exonerated the individual defendants, the Board argues, the district court could not, consistently with seventh amendment, hold their principal liable on this theory.

■ An action for reinstatement and backpay under Title VII is by nature equitable and entails no rights under the seventh amendment. *Lehman v. Nakshian,* 1981, 453 U.S. 156, 163–64, 101 S.Ct. 2698, 2703–04, 69 L.Ed.2d 548, 555–56; *Johnson v. Georgia Highway Express, Inc.,* 5 Cir.1969, 417 F.2d 1122, 1125. An action for damages under § 1981, however, is by nature legal and must be tried by a jury on demand. *See Whiting v. Jackson State University,* 5 Cir.1980, 616 F.2d 116, 122 & n. 4. When legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issues common to both. *See Curtis v. Loether,* 1974, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260, 267 n. 11; *Dairy Queen, Inc. v. Wood,* 1962, 369 U.S. 469, 470–73, 82 S.Ct. 894, 896–97, 8 L.Ed.2d 44, 47–48. When a party has the right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim.

■ According to the Board of Regents, when the jury in this case exonerated the individual defendants in the § 1981 action, it decided the critical issue in the equitable action against the Board, since the Board's liability could follow only from the wrongful acts of its agents. Undoubtedly, a verdict exonerating an agent while holding his principal liable for his actions would be an inconsistent resolution of factual questions. *See Barnes v. West Point Foundry and Ma-*

chine Co., 5 Cir.1971, 441 F.2d 532; Dixie Ohio Express Co. v. Poston, 5 Cir.1948, 170 F.2d 446, 448. Dr. Lincoln argues, however, that the district court in the present case could legitimately make independent factual findings inconsistent with the jury's verdict in the § 1981 action. According to Dr. Lincoln, Dairy Queen, Inc. v. Wood governs only cases in which legal and equitable claims against a single defendant are tried together; it is not binding here because the Board of Regents, as a party to an equitable action only, has no constitutional right to a jury trial on any issue.

▇▇▇ We know of no case either adopting or rejecting the distinction Dr. Lincoln urges upon us. We leave the choice between these alternatives for yet another case, however, because the case before us does not require us to make it. See Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (Brandeis, J., concurring); White v. United States Pipe & Foundry Co., 5 Cir.1981, 646 F.2d 203, 206. The district court's judgment in this case is not inconsistent with the jury verdict on the § 1981 claim.

We have no doubt that a judgment holding a principal liable in a Title VII case of this type would be inconsistent with a verdict exonerating under § 1981 the employees from whose actions Title VII liability derives.[6] This, however, is not the case here, because the district court did not predicate the Board's liability on the actions of Mrs. Terrell or Dr. Hall. Dr. Hall, as acting president of the college in 1978, had the final opportunity to offer Dr. Lincoln a new contract. The district court, however, found that President Jackson, whose liability the jury in the § 1981 action never considered, was in fact responsible for Dr. Lincoln's departure from Savannah State. The court reached this conclusion by two routes.

First, the district court found that Dr. Hall did not reject Dr. Lincoln's application for a new contract, because she never submitted a formal application. The court further found that intolerable conditions surrounding her employment at Savannah State had prompted her not to apply and that these conditions, for which President Jackson was responsible, amounted to "constructive discharge". See Bourque v. Powell Electric Manufacturing Co., 5 Cir.1980, 617 F.2d 61, 64–65; Young v. Southwestern Savings and Loan Association, 5 Cir.1975, 509 F.2d 140, 143–44. Specifically, the court found that President Jackson had removed Dr. Lincoln from teaching responsibilities during the 1977–78 term in the hope that she would not seek continued employment, that her assignment during that term consisted of insignificant tasks that had no relation to her training or experience, and that he put her future in the hands of Dr. Hall, who, as he knew, considered Dr. Lincoln a threat to the "integrity of the institution". Accordingly, the district court concluded that Dr. Lincoln's failure to com-

6. When, as in this case, the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981. Whiting v. Jackson State Univ., 5 Cir.1980, 616 F.2d 116, 121; see also Scarlett v. Seaboard Coast Line R.R., 5 Cir.1982, 676 F.2d 1043, 1053. A plaintiff asserting either claim must prove intentional discrimination. See Baldwin v. Birmingham Bd. of Educ., 5 Cir.1981, 648 F.2d 950, 954. In either case, the plaintiff can create a rebuttable presumption of discrimination by proving the elements of a prima facie case as discussed in Part III. Id. at 955. And the respective burdens of the plaintiff and defendant after a prima facie case is established are the same in both cases. See McWilliams v. Escambia County School Bd., 5 Cir.1981, 658 F.2d 326, 331.

These similarities do not exist when liability under Title VII is premised on the disparate impact of a facially neutral employment practice, rather than on disparate treatment. In such cases, a Title VII violation can be established without a showing of discriminatory motive. See note 9. A violation of § 1981, however, cannot be premised on this theory alone. General Building Contractors Assoc. v. Pennsylvania, 1982, —— U.S. ——, —— —— —— & n. 8, 102 S.Ct. 3141, 3146 & n. 8, 73 L.Ed.2d 835, 844–45 & n. 8. We thus have serious doubt that exoneration of a defendant under § 1981 would be inconsistent with liability of the same defendant or his principal under Title VII on a disparate impact theory.

plete a renewal application "resulted from her reasonable belief that she had in effect been rejected already".

Alternatively, the district court found that even to the extent Dr. Hall may have been ultimately responsible for Dr. Lincoln's nonrenewal, he was acting under guidelines established by President Jackson. Regardless of who had the opportunity to offer Dr. Lincoln a new contract, the court found that it would not have been renewed because of her inability to fulfill President Jackson's requirements. The court found no evidence that Dr. Lincoln had generated enough funding to pay her salary for another year, and Dr. Hall's stated reason for not offering her a new contract was her failure to demonstrate that she had.[7] The district court thus found that on either rationale Dr. Lincoln was not renewed "as a direct consequence of steps taken by Dr. Jackson". The court held the Board of Regents "clearly accountable for these actions under the doctrine of *respondeat superior.*"[8]

The district court's reasoning not only harmonizes its judgment with the verdict on the § 1981 claim but also establishes that the jury's advisory verdict was consistent with that verdict. We may thus easily dispose of Dr. Lincoln's cross-appeal. Dr. Lincoln argues that the jury's overall resolution of the case was inconsistent and requires that the verdict on the § 1981 claim

be set aside. Because we do not find that the jury acted inconsistently, we need not decide whether a separate, nonbinding advisory verdict can render inconsistent and void the jury's resolution of a case committed to it for binding determination.

Although the advisory verdict and the judgment on the Title VII claim are not inconsistent as a matter of law with the verdict on the § 1981 claim, our inquiry does not end with this conclusion. The apparent consistency would evaporate if the evidence did not support the critical finding that President Jackson constructively discharged Dr. Lincoln. We must therefore consider the sufficiency of the evidence on this point. We do so in the course of our general review of the evidence on the Title VII claim.

### III. Sufficiency of the Evidence

The tripartite division of the burdens assigned to the parties in a Title VII case was first articulated in *McDonnell Douglas Corp. v. Green,* 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, and most recently clarified by the Supreme Court in *Texas Department of Community Affairs v. Burdine,* 1981, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. A plaintiff alleging disparate treatment in an action under Title VII has the burden of persuading the trier of fact that the defendant has committed intentional discrimination.[9] *Id.* at 253, 101

---

7. Specifically, Dr. Hall testified as follows: "Since I did not receive a reply from her concerning what she had done, and I had made the request in order to carry out the mandate of Dr. Jackson, I did not offer her a contract for the next year." Trial Transcript (Tr.) 298.

8. As our discussion in Part III will elaborate, the district court's disposition of the case rested to some extent on findings that Mrs. Terrell and Dr. Hall were racially biased against Dr. Lincoln. A finding that these defendants possessed some racial animus, however, is not necessarily inconsistent with the judgment in their favor in the § 1981 action. The jury may have absolved them from liability on the ground that their role was not determinative in the challenged employment decision or that their opposition to Dr. Lincoln, whether misguided or not, was not motivated by any *conscious* racial animus. As the district court instructed the jury on the § 1981 claim, "purposeful racial discrimination" means "conduct

or policies which would result in racial discrimination directed against the plaintiff, where the purpose or intent of that conduct or policy is to be racially discriminatory". The judgment for the plaintiff on the Title VII claim rested on President Jackson's awareness of the racial component in Dr. Hall's and Mrs. Terrell's objections to Dr. Lincoln, not on their own awareness of that component. *See* p. 20.

9. The burden of the plaintiff in a disparate treatment case differs from that in a case involving a claim predicated on disparate impact. Disparate impact cases involve "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive ... is not required under a disparate impact theory." *International Bhd. of Teamsters v. United States,* 1977, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843,

S.Ct. at 1093, 67 L.Ed.2d at 215; *Pouncy v. Prudential Insurance Co. of America,* 5 Cir. 1982, 668 F.2d 795, 799. Although this ultimate burden remains with the plaintiff at all times, the plaintiff may, by proving a *prima facie* case of disparate treatment, shift to the defendant the burden of producing evidence of nondiscriminatory intent. *Burdine,* 450 U.S. at 252–56, 101 S.Ct. at 1093–95, 67 L.Ed.2d at 215–17. To make a *prima facie* case, the plaintiff must establish the four familiar elements required by *McDonnell Douglas:*

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1817, 36 L.Ed.2d at 677; *see also Harrell v. Northern Electric Co.,* 5 Cir.1982, 672 F.2d 444, 449, *modified and reh. denied,* 679 F.2d 31. The specific proof required for a *prima facie* case will naturally vary from case to case. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1817, 36 L.Ed.2d at 677. *McDonnell Douglas* was a hiring case, but variants of its four factors apply in the context of wrongful discharge or nonrenewal as well. *McDonald v. Santa Fe Trail Transportation Co.,* 1976, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493; *Whiting v. Jackson State University,* 5 Cir.1980, 616 F.2d 116, 120. In such a case, the plaintiff can make a *prima facie* case by establishing that he is a member of a minority, that he was qualified for his job, that he was discharged, and that he was replaced by a member of the majority race. *Whiting,* 616 F.2d at 121; *Marks v. Prattco,* 5 Cir.1979, 607 F.2d 1153, 1155. To make a *prima facie*

case, the plaintiff must prove these elements by a preponderance of the evidence.[10] *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1093–94, 36 L.Ed.2d at 215.

A *prima facie* case establishes a presumption of discrimination and shifts the analysis to the second of its three steps, in which the burden of rebutting the presumption falls to the defendant. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. The defendant must "articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1817, 36 L.Ed.2d at 677. What *Burdine* clarified, and what was unclear before, is that the defendant's burden at this point is one of production, not persuasion. The defendant need not persuade the court that it was motivated by nondiscriminatory considerations, nor need it establish by a preponderance of the evidence that such reasons exist. *Burdine,* 450 U.S. at 254, 257–58, 101 S.Ct. at 1094, 1096, 67 L.Ed.2d at 216, 218. The defendant's evidence is sufficient if it "raises a genuine issue of fact as to whether it discriminated against the plaintiff". *Id.* at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. The defendant must raise an issue of fact by means of admissible evidence, however, and averments in pleadings are insufficient. *Id.* at 255 & n. 9, 101 S.Ct. at 1094 n. 9, 67 L.Ed. 2d at 216 n. 9. In addition, the reasons articulated must be "legally sufficient to justify a judgment for the defendant". *Id.*[11]

If the defendant fails to produce sufficient evidence to raise a genuine issue of fact, then the plaintiff will prevail without any further showing. *Id.* at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. If the defendant does succeed in rebutting the

---

1845 n. 15, 52 L.Ed.2d 396, 415 (citation omitted). *See also Burdine,* 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5, 67 L.Ed.2d at 215 n. 5.

**10.** As used in this context, "prima facie case", of course, denotes "establishment of a legally mandatory, rebuttable presumption", not, as it often does, the burden of producing "enough evidence to permit the trier of fact to infer the

fact at issue". *Burdine,* 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7, 67 L.Ed.2d at 216 n. 7.

**11.** For a detailed analysis anticipating the holding in *Burdine* and tying it to Fed.R.Evid. 301, see Mendez, Presumptions of Discriminatory Motive in Title VII Disparate Treatment Cases, 32 Stan.L.Rev. 1129 (1980).

presumption of discrimination, however, the third step in the analysis is required: the burden shifts back to the plaintiff, who must establish by a preponderance of the evidence that the reasons proffered by the defendant are pretextual, not the true reasons for the challenged employment decision. *Id.* at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. He may prove this either by means of affirmative evidence that race played an impermissible role in the decision or by showing that the proffered nondiscriminatory reasons do not merit credence. *Id.*

A plaintiff's burden at this point is equivalent to Dr. Lincoln's overarching burden in the case, that of persuading the court that she is a victim of intentional discrimination. *Id.* In discharging this burden, the plaintiff need not prove that race was the only motive behind the challenged action. *Pittman v. Hattiesburg Municipal Separate School District,* 5 Cir.1981, 644 F.2d 1071, 1076; *see also Turner v. Texas Instruments, Inc.,* 5 Cir.1977, 555 F.2d 1251, 1257. She must prove, however, that race was a *significant* factor in the defendant's decision. *Whiting v. Jackson State University,* 5 Cir.1980, 616 F.2d 116, 121. She will thus prevail on a showing that, although legitimate grounds for the defendant's action existed, the action would not have been undertaken "but for" her race. *McDonald v. Santa Fe Trail Transportation Co.,* 1976, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493, 502; *see also Jackson v. City of Killeen,* 5 Cir.1981, 654 F.2d 1181, 1186.[12]

The district court in the present case found that Dr. Lincoln's contract would have been renewed but for her race. The court noted that the plaintiff bears the ultimate burden of proving racial discrimination and acknowledged both that Dr. Lincoln was not a "perfect teacher or a perfect colleague" and that none of the parties was necessarily "overtly or intentionally racist". But the court found that racial animus was apparent in several respects and concluded from the evidence before it that Dr. Lincoln was denied renewal "not because she was incompetent but because she was white". In reaching this conclusion, of course, the court applied the tripartite analysis of *McDonnell Douglas.*

The district court first found that Dr. Lincoln had made a *prima facie* case. She was in a racial minority at Savannah State, where blacks outnumbered whites approximately two-to-one both on the faculty and in the student body. She was constructively discharged by President Jackson, as we discussed in Part I. The court also found that Dr. Lincoln was qualified for her job, at least in the view of President Jackson, whom it held responsible for her discharge, and that her position was subsequently filled with a black, either Dr. Sara Harper, who joined the department when Dr. Lincoln was assigned to nonteaching responsibilities, or Ms. Diana Wagner, who was originally hired on a temporary basis and would have been terminated if Dr. Lincoln had continued to teach.

The district court then considered and rejected the Board's effort to rebut the presumption of discrimination. The Board introduced evidence that Dr. Lincoln's nonrenewal was motivated by charges of incompetence and lack of rapport with students. Having established that President Jackson was responsible for Dr. Lincoln's constructive nonrenewal, however, the district court found this evidence to lack credibility because President Jackson himself had testified that he found those charges baseless.[13] The district court

---

12. For a recent criticism of the "but for" standard of causation in disparate treatment cases, see Brodin, The Standard of Causation in the Mixed Motive Title VII Action: A Social Policy Perspective, 82 Colum.L.Rev. 290 (1982). Professor Brodin suggests that a Title VII violation should be established on a showing that race was a motivating factor in the challenged employment decision, regardless of whether the same decision would have been reached had race not been considered, and that the question of "but for" causation should affect only remedies. *Id.* at 311–26.

13. The district court apparently held the defendant to too stringent a burden of proof in rejecting its rebuttal evidence. It decided the

found "persuasive evidence that race was the predominant factor". Specifically, the court found that Dr. Hall had separated racial charges from the alleged academic deficiencies early in the review process and that President Jackson had rejected the pure academic allegations. It also found that race was "a significant factor in the initial impression of [Dr. Lincoln] which developed in the Home Economics Department", "the basis for efforts to develop faculty sentiment against her thereafter", and "the focus of student unrest which was created thereafter". According to the district court, the student petition was a "major force" in the decisions leading to Dr. Lincoln's termination. The court concluded that because of her race, Dr. Lincoln's failings were treated more harshly than similar failings in a black teacher would have been and that her contract would have been renewed but for the fact that she is white.

▓▓▓ We may not set aside the district court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); 9 C. Wright & A. Miller, Federal Practice and

Procedure § 2585 (1971). This deferential standard of review imposes an especially heavy burden on the appellant in a case such as this, in which the evidence was largely testimonial, and the district court had the advantage of observing the witnesses and evaluating their credibility firsthand. *See Edwards v. Gladewater Independent School District,* 5 Cir.1978, 572 F.2d 496, 497 (per curiam); *Galena Oaks Corp. v. Scofield,* 5 Cir.1954, 218 F.2d 217, 219. Our deference to the district court is not unlimited, however, and we will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it. *See Ward v. Hobart Manufacturing Co.,* 5 Cir. 1971, 450 F.2d 1176, 1182–84. Even if substantial evidence supports a finding, we must consider the evidence as a whole and set the finding aside if we are "left with the impression it is not the truth and right of the case". *W.R.B. Corporation v. Geer,* 5 Cir. 1963, 313 F.2d 750, 753, *cert. denied,* 1964, 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed.2d 47. Still, "[a] finding is clearly erroneous and reversible under Rule 52(a) only when 'the reviewing court on the entire evidence is

case before the Supreme Court decided *Burdine,* when in this Circuit a defendant was still required to prove nondiscriminatory motive by a preponderance of the evidence to rebut a *prima facie* case, *see Burdine v. Texas Dep't of Community Affairs,* 5 Cir.1979, 608 F.2d 563, *vacated,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. The district court stated that "Defendant has failed to show that these nonracial considerations in fact contributed to the decisions" that led to Dr. Lincoln's departure, and this language suggests a failure to carry the burden of persuasion.

The "clearly erroneous" standard under which we review the district court's factual findings, *see* pp. 16–17, does not insulate factual findings influenced by legal error. *Johnson v. Uncle Ben's, Inc.,* 5 Cir.1980, 628 F.2d 419, 422, *vacated on other grounds,* 1981, 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290; 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 52.03[2] at 2664 (2d ed. 1982). If the district court relied on an erroneous view of a Title VII defendant's burden in finding that it has not rebutted a *prima facie* case, that finding is not binding on the Court of Appeals. *Turner v. Texas Instruments, Inc.,* 5 Cir.1977, 555 F.2d 1251, 1256. We need not depart from the "clearly erroneous" standard, however, if application of the wrong legal standard did not "taint or infect" the district court's factual find-

ings. *See Smith v. United States,* 5 Cir.1974, 502 F.2d 512, 519. Thus, if the district court's resolution of the case did not depend on the defendant's inability to rebut under an incorrect standard, as it did in *Turner,* but relied instead on the plaintiff's success with her ultimate burden of proving discrimination by a preponderance of the evidence, and if the "progression of factual findings and legal conclusions indicates that the district court found by a preponderance of the evidence" that the defendant's rebuttal was "unworthy of credence", then the court's findings "are fully consistent with *Burdine*". *Ford Motor Co. v. EEOC,* 1982, —— U.S. ——, —— n. 7, 102 S.Ct. 3057, 3062 n. 7, 73 L.Ed.2d 721, 728 n. 7.

The district court expressly held the plaintiff to "the ultimate burden of proof with respect to her claim of racial discrimination". Moreover, as the discussion in the text illustrates, the court's Findings of Fact and Conclusion of Law clearly demonstrate that it found the plaintiff had ultimately carried her burden of proving by a preponderance of the evidence that the defendant's rebuttal lacked credence, regardless of the standard initially applied in evaluating the rebuttal. We are thus bound by the district court's finding that Dr. Lincoln's contract would have been renewed but for her race, unless that finding is clearly erroneous.

left with a definite and firm conviction that a mistake has been committed'". *Williamson v. Brown,* 5 Cir.1981, 646 F.2d 196, 200 (per curiam) (quoting *United States v. United States Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746).

This Court has held, in a long line of cases, that the "clearly erroneous" standard insulates only findings of "subsidiary fact", and that the determination whether impermissible intentional discrimination has occurred in a Title VII case is one of "ultimate fact", which we "may reverse free of the clearly erroneous rule". *Causey v. Ford Motor Co.,* 5 Cir.1975, 516 F.2d 416, 421 (quoting *Industrial Instrument Corp. v. Foxboro Co.,* 5 Cir.1962, 307 F.2d 783, 786 n. 2).[14] The Supreme Court, however, has

recently rejected this view, and it is now the law that this Court may reverse a finding of intentional discrimination only if the finding is clearly erroneous. *Pullman-Standard v. Swint,* 1982, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66, 78–81; *see also Mitchell v. M.D. Anderson Hospital,* 5 Cir.1982, 679 F.2d 88. Accordingly, we will reject the district court's finding that Dr. Lincoln's contract would have been renewed but for her race, only if we find it clearly erroneous.[15] We hold that it was not clearly erroneous.[16]

■ We first note that the district court committed no clear error in finding that President Jackson was responsible for Dr. Lincoln's constructive discharge.[17] The dis-

14. *See also, e.g.,* cases cited in *Pullman-Standard v. Swint,* 1982, 456 U.S. 273, 285 n. 15, 102 S.Ct. 1781, 1788 n. 15, 72 L.Ed.2d 66, 78 n. 15; *Williams v. New Orleans S.S. Ass'n,* 5 Cir.1982, 673 F.2d 742, 746; *Harrell v. Northern Elec. Co.,* 5 Cir.1982, 672 F.2d 444, 445–46; *De Anda v. St. Joseph Hosp.,* 5 Cir.1982, 671 F.2d 850, 855; *Pouncey v. Prudential Ins. Co. of America,* 5 Cir.1982, 668 F.2d 795, 798; *Wright v. Western Elec. Co.,* 5 Cir.1981, 664 F.2d 959, 963; *Robbins v. White-Wilson Medical Clinic, Inc.,* 5 Cir.1981, 660 F.2d 1064, 1068, *vacated,* 1982, 456 U.S. 969, 102 S.Ct. 2229, 72 L.Ed.2d 842; *Sanchez v. Texas Comm'n on Alcoholism,* 5 Cir.1981, 660 F.2d 658, 661; *Markey v. Tenneco Oil Co.,* 5 Cir.1981, 635 F.2d 497, 498; *Hester v. Southern Ry.,* 5 Cir.1974, 497 F.2d 1374, 1381; *Bolton v. Murray Envelope Corp.,* 5 Cir.1974, 493 F.2d 191, 194; *United States v. Jacksonville Terminal Co.,* 5 Cir.1971, 451 F.2d 418, 423–24, *cert. denied,* 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815.

The distinction between subsidiary and ultimate facts for purposes of appellate review in this Circuit did not originate in the Title VII context and goes back at least a decade before the enactment of Title VII. In *Galena Oaks Corp. v. Scofield,* 5 Cir.1954, 218 F.2d 217, the question of ultimate fact was whether gain derived from the sale of houses was ordinary income or capital gain. The court reasoned that questions of ultimate fact are akin to mixed questions of fact and law, stating that findings of ultimate fact are "simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts". *Id.* at 219.

15. The Supreme Court in *Pullman-Standard* expressly left open the question whether "clearly erroneous" review under Fed.R.Civ.P. 52(a) applies to genuine mixed questions of law and fact, "questions in which the historical facts

are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated". 456 U.S. at 289 n. 19, 102 S.Ct. at 1790 n. 19, 72 L.Ed.2d at 80 n. 19. The case before us presents no such question, since the district court's finding that Dr. Lincoln's contract would have been renewed "but for her race", if correct, would clearly justify relief under Title VII, *McDonald v. Sante Fe Trail Transp. Co.,* 1976, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493, 502 n. 10. We thus review this finding only to determine whether it was clearly erroneous.

16. The Board of Regents argues that concerns peculiar to the University setting, particularly the need for academic freedom in faculty employment decisions, warrant some judicial deference to the nondiscriminatory reasons proffered for an employment decision and, by implication, more searching appellate review of a district court decision rejecting such reasons. This argument is without merit. *Whiting v. Jackson State University,* 5 Cir.1980, 616 F.2d 116, 121.

17. The Board of Regents does not attack this finding. Rather, the Board misconstrues the district court's order to rely on the premise that Dr. Hall was responsible for Dr. Lincoln's non-renewal. We consider the sufficiency of the evidence supporting this finding, however, because it is critical to our conclusion, discussed in Part I, that the judgment on the Title VII claim was not inconsistent with the jury verdict on the § 1981 claim.

The Board's misinterpretation of the district court's factual findings seems to derive from

trict court relied on uncontradicted testimony that President Jackson had removed Dr. Lincoln from teaching responsibilities and assigned her to duties not commensurate with her professional experience or training. It is also undisputed that President Jackson did this in the hope that she would resign and that he established the standard that would require Dr. Lincoln's ultimate dismissal if she failed to generate her own salary with outside funding. Finally, it is undisputed that President Jackson knew that Dr. Hall would approach the task of reviewing Dr. Lincoln's performance with unfavorable preconceptions about her abilities. This evidence, against the background of Dr. Lincoln's career at Savannah State, supports the district court's finding that President Jackson made continued employment at Savannah State so unattractive to Dr. Lincoln that he caused her not to apply for a new contract.

The Board of Regents attacks both the district court's finding that Dr. Lincoln established a *prima facie* case and its rejection of the nondiscriminatory reasons articulated for the treatment accorded her. Concerning the *prima facie* case, the Board addresses only two of the *McDonnell Douglas* factors. It does not dispute that Dr. Lincoln was in a racial minority at Savannah State, nor that it failed to re-employ her. The Board argues, however, that Dr. Lincoln was not replaced by a black, because Sara Harper, her alleged replacement, had been employed throughout Dr. Lincoln's last year, when the department had five members rather than the customary four. The Board also argues that Dr. Lincoln was not qualified for the position she was ultimately denied, by virtue of her own admissions that she lacked credibility and rapport with the majority of her students, Trial Transcript (Tr.) 91–92.

In finding that Dr. Lincoln was replaced by a black, the district court relied on President Jackson's testimony that the home economics department would sustain only four faculty members, *id.* at 136,[18] that the search for a new department head after Mrs. Terrell's retirement in 1976 would eventually displace the acting head and require the termination of one of the other three faculty members, *id.* at 135, and that when Dr. Lincoln was transferred to the Dean's Office, Dr. Sara Harper, who is black, moved into "Dr. Lincoln's slot", *id.*

the assumption that Dr. Lincoln's complaint alleged only the actions of Dr. Hall and Mrs. Terrell as grounds for holding the Board of Regents liable and did not ask the court to find that President Jackson had discriminated against her. We need not consider whether the district court must limit its factual findings to theories of recovery advanced by the plaintiff, because in this case we believe the Board has interpreted Dr. Lincoln's theory of recovery too narrowly. Although her Original Complaint accused the Board of discrimination "through its agents, Defendants CLYDE W. HALL, EVANEL TERRELL, and DIANA WAGNER", it also alleged generally that she was discharged "so as to provide a vacancy that was filled with a Black Female" and "because she was white, and for reasons for which Blacks are not terminated". These allegations directly relating to the termination itself did not mention the named defendants as agents or otherwise. Moreover, in the amended complaint, the Board of Regents was eliminated from the first-quoted allegation, which then included *only* the individual defendants. At this point, the Board's liability could be predicated only on the more general allegations that followed. In addition, the plaintiff's proposed jury charge on the Title VII claim referred to the Board "acting through its employees at Savannah State College" without specifying the individual defendants as the employees in question. The district court's instructions to the jury were equally general. The Board of Regents does not argue that the exclusion of President Jackson as a named defendant precludes the district court from holding it liable for his actions, and we see no reason to hold that *respondeat superior* is inoperative in Title VII cases unless the agent is made a party.

**18.** This testimony, of course, directly contradicts the Board's critical assertion that during Dr. Lincoln's last year, the department had five members. Although it is possible that Dr. Lincoln was nominally a member of the department during 1977–78, however, it is established that she performed no duties within the department, and there is no evidence that the home economics budget could support five faculty members for more than one year, when unusual circumstances required it. In any case, President Jackson's testimony is not so inherently incredible that we can hold the district court clearly erroneous for choosing to credit it.

This testimony supports the finding that Dr. Lincoln was replaced by a black, and in the absence of conflicting testimony, we cannot hold that finding clearly erroneous.

The district court based its finding that Dr. Lincoln was qualified to teach at Savannah State on President Jackson's testimony that he considered the case against her weak, *id.* at 143, that he found her "as competent as anybody we have out there," *id.* at 138, and that she had displayed concern for students "beyond the ordinary call", *id.* Although there is considerable evidence in the record that Dr. Lincoln lacked a good rapport with her students and was deficient in other significant ways, this evidence would not justify our declaring clearly erroneous the trial court's choice to credit President Jackson's testimony. This is particularly so because that testimony is bolstered both by Dr. Lincoln's impressive

credentials, *see* p. 3, and by the testimony of three students whose names appeared on the petition, that Dr. Lincoln was either "just like any other teacher", Tr. 98, 101, or otherwise not as bad as the petition alleged, *id.* at 113.

In finding that the Board's asserted reasons for nonrenewal of Dr. Lincoln's contract lacked credibility, the district court, as noted above, *see* p. 15, relied both on Dr. Jackson's own testimony that he found the allegations concerning her academic deficiencies to lack merit and on findings that the student petition and faculty sentiment against Dr. Lincoln, which contributed to her constructive discharge, were influenced by racial considerations. These findings in turn rested on language in the petition itself,[19] evidence that members of the faculty participated in preparing and circulating the petition,[20] and evidence that faculty

19. The student petition consisted of four type-written, single-spaced pages, alleging numerous failings of Dr. Lincoln as a teacher. The substantive allegations followed three introductory paragraphs, the second of which read:

As a group, *we feel that she is not interested in teaching us and feels superior to Black students and Black institutions.* In Spring Quarter 1976, Dr. Lincoln complained to Mrs. Lumpkin that she had come all the way down here from Lansing, Michigan, to help "you people" and her services were not appreciated. The "you people" complaint was mentioned again during Fall Quarter 1976 after Dr. Hall had observed her teaching and held a conference. *This type of attitude is insulting. Other racists have been removed from Savannah State College.* She constantly belittles the Department's physical plant and its equipment. In Summer Quarter 1975 when she was forced to take inventory, she stated that the inventory was not worth taking and all the equipment should be thrown in the marsh.

Plaintiff's Exhibit No. 2 (emphasis added). The district court found that the "direct and clear appeal" of the petition was racial. Record (R.) 171. As the Board of Regents points out, a petition alleging that a teacher is a racist does not on its face purport to call for her removal because she is white. There is considerable evidence, however, that Dr. Lincoln possessed no racial prejudice, *e.g.,* Tr. 107, 126, and that some signers of the petition did not believe she was a racist, *e.g. id.* at 113. The district court may thus reasonably have inferred that a deeper significance rested in the allegations of racism.

20. Mrs. Terrell testified that, although she was retired at the time, she was in communication with the students preparing the petition, Tr. 173, and "gave support" for its signing, *id.* at 172. Martha Corley, who is black and a member of the home economics faculty, testified that the language of the petition was not likely that of students, *id.* at 108, although Professor Milledge, a teacher of English who chaired the first committee that reviewed Dr. Lincoln's status, testified to the contrary, *id.* at 207–08. Dr. Jackson testified that students who signed the petition told him they had left class one-by-one to sign it in a teacher's office. *Id.* at 326. One student, a black, told him that a black teacher had held up one of her grades because she had not signed the petition, *id.,* and another student told him she signed it because "she wanted to graduate" and "wasn't going to take any chances", *id.* at 327. President Jackson considered it "obvious" that the purported student leader had not drafted the petition. *Id.*

In addition to this evidence, it is relevant that the first substantive allegation in the petition concerned a dispute between Dr. Lincoln and Mrs. Terrell, rather than any dissatisfaction with Dr. Lincoln's classroom performance, *see* note 5. It is not readily apparent how this incident came to the attention of the students. Nor is it apparent how the dispute concerning inventory, referred to in the portion of the petition quoted in note 19, came to their attention. Mrs. Terrell testified that she did not inform them of it. Tr. 184. Finally, the petition included language that Mrs. Terrell had used in referring to Dr. Lincoln, such as "anarchy", and other terminology that witnesses associated with Mrs. Terrell, *e.g., id.* at 109.

members, particularly Mrs. Terrell and Dr. Hall, possessed racial animus. The district court credited testimony that Mrs. Terrell had referred to Dr. Lincoln as "this white lady [who] came down here thinking she was going to get some easy retirement", Record (R.) 169 (quoting Tr. 129), that Dr. Hall had told another black faculty member that he "hate[d] white people", *id.* at 170 (quoting Tr. 104), and that the latter considered race an "important consideration" in choosing a department head, *id.* at 178 n. 7 (quoting Tr. 133). This evidence, combined with President Jackson's testimony that Dr. Lincoln was no worse than most teachers at Savannah State, supports the finding that racial concerns played a role in both faculty and student dissatisfaction with Dr. Lincoln. The Board of Regents, on appeal, seeks to discredit the evidence of faculty involvement in the student petition and racial bias on the part of faculty members.[21] But it can point to no testimony in the record contradicting the evidence of faculty involvement and no testimony, apart from the denials of Mrs. Terrell and Dr. Hall, *see* Tr. 176, 256, that they did not make the statements attributed to them.[22] We cannot hold the district court clearly erroneous for choosing to believe disinterested witnesses rather than parties to the action.

The evidence in this case, as the district court described it, was "often contradictory, confused, and at points quite sketchy". R. 183. The district court found intentional discrimination but was "unwilling to conclude ... that any of the parties were necessarily overtly or intentionally racist". *Id.* It held President Jackson responsible for Dr. Lincoln's constructive discharge, yet it did not find that he possessed any racial bias. Intentional discrimination, however, is possible without racial bias as such.[23] The district court found that race impermissibly influenced the faculty and student actions prompting President Jackson to put Dr. Lincoln in such a position that she would not seek a fifth contract. The evidence also supports the finding that President Jackson, particularly in view of his own assessment of Dr. Lincoln's abilities, was aware that race was a determinative factor in those faculty and student actions, whether or not those calling for her ouster were "overtly or intentionally racist". In acting on charges he knew to be racially motivated, President Jackson intentionally discriminated. The district court found from the evidence that Dr. Lincoln would have sought and received a new contract, but for her race. We cannot say we are "left with a definite and firm conviction that a mistake has been committed", *United States v. United States Gypsum Co.,* 1948,

**21.** Much of the appellant's argument consists of an effort to establish that Dr. Hall acted out of no racial animus when he chose not to offer Dr. Lincoln a fifth contract. The district court, however, did not find that Dr. Hall was so motivated at the time and did not consider the question. The court's finding that President Jackson was responsible for Dr. Lincoln's constructive nonrenewal made inquiry into Dr. Hall's motives irrelevant. *See* pp. 10–11 & 17 note 17. Our task is thus only to determine whether the district court clearly erred in finding that race played an impermissible role in President Jackson's actions.

**22.** According to Dr. Lincoln, Mrs. Terrell had also stated on many occasions that "Dr. Anthony is really one of us.... [H]er sister's skin is almost as dark as mine." *Id.* at 28. (Dr. Anthony is of Lebanese extraction. *Id.*) Mrs. Terrell denied making this comment as well. *Id.* at 177.

**23.** *See Robbins v. White-Wilson Medical Clinic, Inc.,* 5 Cir.1981, 660 F.2d 1064, *vacated and remanded,* 1982, 456 U.S. 969, 102 S.Ct. 2229, 72 L.Ed.2d 842. In *Robbins,* this Court upheld as not clearly erroneous the district court's finding that the individual alleged to have discriminated "possessed no racial bias or animus as such". The Court reversed, however, the district court's "ultimate" finding that no intentional discrimination had occurred. *See* pp. 1560–1561. The Supreme Court remanded the case for further consideration in the light of *Pullman-Standard, Inc. v. Swint,* 1982, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66, and on remand, this Court upheld, under "clearly erroneous" review, the district court's finding that no intentional discrimination had occurred, *Robbins v. White-Wilson Medical Clinic, Inc.,* 5 Cir.1982, 682 F.2d 503, 504.

333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766.[24]

## CONCLUSION

The judgment for the plaintiff on her Title VII claim against the Board of Regents is neither inconsistent with the jury verdict on the § 1981 claim nor clearly erroneous on the basis of evidence before the district court. The jury verdict was not inconsistent, and there is no reason to set it aside. Accordingly, the judgment of the district court is in all respects AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

I dissent for two reasons: (1) the majority, in effect, overrules *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); and (2) the trial court and majority select as a discriminatory act one time-barred by statute, which ousts both courts of jurisdiction.

The majority opinion finds liability against the Board of Regents following the theory advanced by the district court that Dr. Jackson, "whose liability the jury in the § 1981 action never considered, was in fact responsible for Dr. Lincoln's departure from Savannah State." On this theory, the majority emasculates the holding in *Dairy Queen.* Although the majority correctly recognizes that when legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issues common to both, its holding provides a rationale by which the rule of *Dairy Queen* may be avoided.

The rule announced today instructs plaintiffs in jointly instituted Title VII and § 1981 actions, that *Dairy Queen* may be avoided by simply failing to name one of the agent defendants in the § 1981 suit. If the agent defendant is not named in the § 1981 action, the trial judge is free to find facts as to the unnamed agent and thereby render the principal liable in the Title VII action. Additionally, under the majority's holding, the principal may be found liable based on acts of the unnamed agent without any notice to the principal that the unnamed agent's actions are suspect. The judge in this case was bound by the jury's determination that *no named agent of the Board of Regents was guilty of a discriminatory practice.*

Dr. Lincoln's complaint names as party defendants the Board of Regents, Dr. Hall, Mrs. Terrell, and Ms. Wagner. Nowhere in the complaint was liability sought to be imposed on the Board for the acts of Dr. Jackson. In spite of this, the trial court and majority here impose liability on the Board on the basis of acts performed by an agent of the Board not named in the lawsuit and not defended at trial. This is precisely the sort of mischief *Dairy Queen* intended to curb. Moreover, if the discriminatory act that renders the Board liable is that of Dr. Jackson, then no jurisdiction existed in the district court. Title VII requires aggrieved persons to file a complaint with the EEOC within 180 days after the alleged unlawful employment practice occurs. 42 U.S.C.A. § 2000e–5(e). On April 1, 1977, Dr. Jackson notified Dr. Lincoln by memo that she was being terminated for cause. A formal letter to Dr. Lincoln on April 25, 1977, informed her of this course of action. On June 1, 1977, another letter from Dr. Jackson informed Dr. Lincoln of the reasons for her termination. Because the April 25, 1977, date is by law the date on which the alleged unlawful employment practice occurred, Dr. Lincoln should have notified the EEOC by October 22, 1977, to come within the 180 day limitation. There is nothing in the record to indicate that an EEOC complaint was filed within 180 days of Dr. Jackson's alleged discriminatory employment practice. A good reason exists for the absence in the record; no one, other than the judges in this case, ever considered Dr. Jackson's actions as *the acts giving rise to this lawsuit.*

24. We note that the jury, charged with returning an advisory verdict, apparently reached the same conclusion. Although the advisory verdict is not strictly relevant to our review of this case, and does not influence our decision, we consider the point worth mentioning. As we have discussed earlier, the advisory verdict is not impeached by any purported inconsistency with the verdict exonerating Mrs. Terrell and Dr. Hall. *See* p. 936.