**Mary Lee CARTER, Plaintiff,**

**v.**

**COMMUNITY ACTION AGENCY OF CHAMBERS, TALLAPOOSA and COOSA COUNTIES, INC.; and Harold C. White, etc., Defendants.**

**Civ. A. No. 84-T-1343-E.**

United States District Court, M.D. Alabama, E.D.

Nov. 7, 1985.

---

Kenneth L. Thomas, and Randy Stephens, Gen. Counsel, Alabama Educ. Ass'n, Montgomery, Ala., for plaintiff.

Fred D. Gray, Gray, Langford, Sapp, Davis & McGown, Tuskegee, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Mary Lee Carter, a white person, has brought this lawsuit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17, against defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc. and defendant Harold C. White, the agency's former executive director. She claims that the agency and White terminated her employment because of her race.

Based on the evidence presented at a nonjury trial, the court finds that her claim has merit and that she is thus entitled to appropriate relief.

## I.

The Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc. is a federally regulated but locally operated agency created to combat poverty in the agency's three-county area of operation in the State of Alabama. 42 U.S.C.A. §§ 9801–9822 (1983). The agency's work force and the recipients of its services are mostly black. A board of directors, composed of approximately one-half white and one-half black members, has general legal and fiscal responsibility for the operation of the agency. An executive director is entrusted with the agency's day-to-day operation.

One of the agency's largest and most important programs is the Head Start Program, which is funded and regulated by the U.S. Department of Health and Human Services (HHS). 42 U.S.C.A. §§ 9831–9852 (1983). This program's general goal is to "bring about a greater degree of social competence in children of low income families." 45 C.F.R. § 1304.1–3(b) (1984). This program serves several hundred children, most of whom are black.

The Head Start Program has its own director who is vested with day-to-day responsibilities for the program's operation and who reports directly to the agency's executive director. The program also has a policy council which must approve or disapprove most major decisions relating to Head Start. The council is composed of community representatives and parents of Head Start children and is predominantly black.

In January 1981, the agency hired Mary Lee Carter, a white person, as director of the Head Start Program. In December of the same year, the agency hired Harold C. White as executive director. White was the agency's first black executive director.

From the beginning of his employment, White had difficulties with members of the agency's board of directors, primarily its white members. These members charged White with mismanagement, misuse of funds, and with discriminating against white employees. White countered that these board members were discriminating against him by subjecting him to unwarranted charges and to closer scrutiny than the previous white executive director.

Carter, in turn, had difficulties with White. For example, White excluded Carter from many decisions involving the Head Start Program. Carter would make recommendations about such matters as the Head Start budget and teacher training. White would not only reject her recommendations, he would exclude her from any further involvement in such matters. White also allowed Carter's staff, which was all or mostly black, to meet with him regularly without first going through Car-

ter. He also called meetings of the predominantly black policy council without including Carter. The effect of White's treatment of Carter was not only that she was ostracized and her duties usurped, but she came to be unjustly viewed by her staff and policy council as a white person who could not be trusted and was probably racist. White created an atmosphere in the Head Start program that Carter was "one of them" and "not one of us." White did not treat other, black program heads this way.

In early 1983, the black chairperson of the agency's board of directors created the Executive Head Start Committee, a predominantly white committee, to deal with the problems in the Head Start Program. The committee had been created at the urging of Carter and Jasper Fielding, a white member of the board. On April 5, 1983, an official from the HHS regional office in Atlanta, Georgia met with Carter and others and suggested that the board's and the committee's direct involvement in the Head Start Program might be illegal.

On April 7, 1983, Carter submitted her resignation to White, effective May 31. Four days later, White accepted it and began advertising for a new Head Start director. In the meantime, at the suggestion of Jasper Fielding, Carter decided to rescind her resignation, but only if the following conditions were met:

—Any document added to my personnel folder must first be reviewed and approved by the Executive Head Start Committee;

—My role as direct supervisor of Head Start staff must not be circumvented. All alleged incidents of circumvention will be reviewed and addressed by the Executive Head Start Committee;

—The grantee staff, headed by Harold White, is formally instructed to provide support and assistance in the performance of my operational responsibilities under Head Start Manual, Appendix B, . . . .

—I understand that, in carrying out my responsibilities, I must comply with direct orders of my supervisor, Harold White. I request, however, that I be specifically guaranteed the right to receive such orders in writing, enabling me to appeal orders which I believe are violations of Board policy or of state or federal law.

On April 27, the policy council held a regularly scheduled meeting. The chairperson of the council was Gloria Tinsley, a black person. Shortly after the close of the meeting, after Carter and the white members had left, Tinsley and some other black members of the council held another, unannounced meeting where they signed a letter accepting Carter's resignation. The name of one of the white members who had attended the first meeting was forged to the letter.

On April 28, the board of director's Executive Head Start Finance Committee met and voted to recommend to the board that it accept Carter's withdrawal of her resignation on her conditions. White was not present at this committee meeting. Although he was a member of the committee, he had not been consulted prior to the meeting, nor had he been given notice of the meeting.

Immediately following the meeting of the Executive Head Start Finance Committee, the board of directors held one of its regularly scheduled meetings. As people assembled, Carter handed White her letter withdrawing her resignation with conditions. At the board meeting, White complained that the board was without authority to allow Carter to withdraw her resignation. The board voted eleven to zero, with seven abstentions, to allow Carter to withdraw her resignation on her stated conditions. The vote was for the most part along racial lines, with ten white persons and one black person voting to allow Carter to withdraw her resignation and six black persons and one white person abstaining.

In the days following the board meeting, Gloria Tinsley, the black chairperson of the policy council, wrote a letter to the HHS regional office in Atlanta, Georgia, complaining that the board had acted without

legal authority and that the Head Start staff was opposed to Carter's return. Tinsley and White later travelled to Atlanta to confer personally with the regional officials. In response to the complaints from White and Tinsley, the HHS regional office informed the board that it had acted improperly and without authority in accepting Carter's withdrawal of her resignation and that Carter's withdrawal of her resignation must first be approved by the executive director and the policy council.

On May 10, the board met again. Tinsley recruited and arranged for black parents to be present. The meeting was so racially charged and tense that local police had to be present. Many of the black speakers, many of those in the predominantly black crowd, and even signs on the walls accused the white board members of being racist and taunted the black board member who supported Carter for being on the wrong side. White and Tinsley also told the board that they believed that the board's actions were racially motivated; and White further accused Carter of not being able to accept supervision from him because he was black.

In the days and weeks following the May 10 board meeting, the board, White, and Tinsley held firm to their various positions. Some effort was made without success to get the board to rescind its action. Carter wrote Tinsley requesting that her withdrawal of her resignation be placed on the agenda of the next policy council meeting. Tinsley denied the request without even consulting the other members of the policy council. Finally, the board appointed Virginia Robinson, a black person, to serve as temporary director of the Head Start Program.

For the remainder of 1983 and for the early part of 1984, the HHS regional office in Atlanta, while maintaining its position that the board acted without legal authority, attempted to help the agency and its officials resolve their problems. Finally, in February 1984, the regional office directed the agency to initiate the process for filling the Head Start director position. The board complied, and both Robinson and Carter were among the applicants. Robinson was selected. Carter was rejected principally because the board felt it was not in the best interest of the agency to rehire her in view of White's past conflict with her.

As a result of the above events, White's termination of Carter's employment after she withdrew her resignation became the act of the agency.

Later, in 1985, White resigned as executive director for another job.

## II.

As previously stated, Carter rests her claim of race discrimination on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17.

### A.

Carter has exhausted the administrative remedies required by Title VII. 42 U.S.C.A. § 2000e–5. In August and October 1983, she filed timely administrative charges with the Equal Employment Opportunity Commission, claiming that White and the agency terminated her employment because of her race. She alleged that White and the agency forced her to resign and then refused to accept her withdrawal of her resignation, all because of her race. In July 1984, without making a finding, the commission issued a "Notice of Right to Sue" to Carter. And, in October 1984, Carter timely filed this lawsuit, making essentially the same claim she made in the administrative charges.

### B.

In determining whether Title VII has been violated where, as here, the evidence is primarily circumstantial, a court should employ the allocation of burdens and order of proof established in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Hill v. Seaboard Coast Line R. Co.*, 767 F.2d 771, 773–74 (11th Cir. 1985); *Lincoln v. Board of Regents of the*

*University System of Georgia*, 697 F.2d 928, 935 n. 6 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). A plaintiff has the initial burden of establishing a prima facie case of racial discrimination by a preponderance of evidence, *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94, which once established raises a presumption that the defendant racially discriminated against the plaintiff. *Id.*, at 254, 101 S.Ct. at 1094. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the defendant discriminated against the plaintiff. This may be done by the defendant articulating a "legitimate, non-discriminatory reason" for its actions against the plaintiff, a reason which is "clear and reasonably specific" and worthy of credence. *Id.*, at 253, 258, 101 S.Ct. at 1093, 1096. The defendant has a burden of production, not one of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Id.*, at 254, 101 S.Ct. at 1094. Once the defendant satisfies this burden of production, the plaintiff then has the burden of persuading a court that the proffered reason for the employment decision is a pretext for racial discrimination. The plaintiff may satisfy this burden by persuading the court either directly that a racially discriminatory reason more than likely motivated the defendant or indirectly that the proffered reason for the discharge is not worthy of belief. *Id.*, at 256, 101 S.Ct. at 1095. By so persuading the court, the plaintiff satisfies the required ultimate burden of demonstrating by a preponderance of evidence that he or she has been the victim of intentional racial discrimination. *Id.*

### C.

■ A plaintiff may establish a prima facie case of racially discriminatory termination of employment by showing by a preponderance of the evidence that he or she is a member of a racial minority, was qualified for job held, was terminated from

the job, and was replaced by a member of the majority race. A person may be considered a member of a racial minority for Title VII purposes if the employees and administrators of the entity for which the person works are predominantly of another race. *See, e.g., Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983) (white faculty member at predominantly black college was a member of "racial minority" for Title VII purposes.)

■ Carter has established a prima facie case. She was a member of a racial minority, for she is white and worked for a predominantly black agency; she was qualified for her job; she was terminated from her job; and she was replaced by a black person. That the agency was substantially controlled by the white members of the board of directors does not detract from the conclusion that she was a member of a racial minority. The Head Start staff was predominantly black; and those principally responsible for hiring and discharging the Head Start director and staff were the black executive director and the black controlled policy council. Indeed, White has consistently maintained that the white dominated board had, by HHS regulations, little to no control over the hiring and firing of Head Start personnel. The scenario here was therefore that of a white employee in a work environment populated and controlled, for the most part, by black persons.

### D.

■ White and the agency have met their burden of articulating a legitimate, nondiscriminatory reason for terminating Carter's employment after she withdrew her resignation. In fact, they have articulated several reasons. Carter has convinced the court, however, that these reasons are but a pretext for racial discrimination.

First, White and the agency advance that they terminated Carter's employment be-

cause she resigned. This reason fails to explain why White refused to accept Carter's withdrawal of her resignation. There is no evidence that the agency had a policy or practice of not accepting withdrawals of resignations.

White and the agency also advance that they could not accept Carter's withdrawal of her resignation because the job had already been advertised. This reason is meritless. There is no credible evidence that at the time Carter withdrew her resignation any one had applied for the job or had been offered the job. Moreover, White did not list this reason in responding to a request from the U.S. Equal Employment Opportunity Commission to explain why he terminated Carter's employment. The advertising of the job was not a true barrier to accepting Carter's withdrawal of her resignation, if indeed White wanted her to continue as director of the Head Start Program.

White and the agency contend that Carter failed to follow proper procedures by not presenting her resignation withdrawal to White and the policy council first. They further contend that she set unreasonable conditions for her continued employment. Those reasons appear on their face to justify White's refusal to accept Carter's withdrawal of her resignation.* However, a deeper analysis is warranted here. The court is convinced that White entered into a scheme to force Carter out of the agency because she was white. He personally ostracized her and usurped her duties; and, with the help of Tinsley, the black chairperson of the policy council, he mobilized Carter's black staff members and the black policy council members against Carter. Admittedly, White and Carter disagreed over such matters as the Head Start Budget and what school should have the training contract for Head Start teachers. However, their disagreements did not warrant White's severe, cruel treatment of Carter. Carter did nothing to merit such treatment.

The evidence therefore reflects that for racial reasons White made the conditions of Carter's employment so intolerable that he, in effect, forced her to retreat to the board and the board's Executive Head Start Finance Committee for relief; and that he, in effect, forced her to set conditions to make her continued stay more tolerable. Carter's conduct was but a reasonable and necessary response to—indeed, a product of—White's racially discriminatory treatment of her.

White and the agency contend that the policy council was unwilling to accept Carter's rescission of her resignation because of complaints from Head Start parents and staff. The evidence contains no credible evidence that Head Start parents and staff were dissatisfied with Carter's performance. The evidence is clear that Carter was an efficient and effective director of the Head Start Program; indeed, White himself was unable to point the court to any evidence to the contrary during his testimony. The record does, however, contain considerable evidence of racial animosity by black members of the policy council against Carter. This racial animosity was generated and fanned by White as a part of his scheme to get rid of Carter because of her race. Any unwillingness of the policy council to accept Carter's withdrawal of her resignation was just a part of White's racially motivated scheme to get rid of her.

White and the agency contend that their actions were proper because the HHS regional office upheld the termination of Carter's employment. It is apparent that the HHS regional office was principally concerned with *who* had the authority to accept or reject Carter's withdrawal of her resignation, not with *why* White refused to accept her withdrawal. Nevertheless, to the extent the HHS regional office's ac-

---

* That Carter failed to follow proper procedures is, in fact, not all that clear. The HHS regulations, which may easily be described as very confusing, do not specifically speak to withdrawals of resignations. Furthermore, although the HHS Atlanta regional office maintained that Carter failed to follow proper procedures, the office was inconsistent in its recommendation of what Carter should have done.

tions could be viewed as approving the basis for White's conduct, this court disagrees with the office. And, of course, in causes such as this, this court is not bound by the HHS regional office's findings and opinions as to whether someone has been a victim of racial discrimination.

■ But finally and most importantly, the above reasons advanced by White and the agency fail to overcome the fact, as found by the court, that White and the agency forced Carter to resign because of her race. As stated, White made Carter's working conditions so intolerable that she had no choice but to resign. Carter is entitled to appropriate relief for this fact alone, irrespective of her fruitless efforts to have the withdrawal of her resignation accepted. For,

> The general rule is that if the employer deliberately makes an employee's working condition so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Buckley v. Hospital Corporation of America, Inc.*, 758 F.2d 1525, 1530 (11th Cir.1985), *quoting Young v. Southwestern Savings & Loan Association*, 509 F.2d 140, 144 (5th Cir.1975). But for Carter's race she would still be working for the agency.

■ White and the agency have suggested that White was himself a victim of racial discrimination. Admittedly, there is considerable evidence that most of the white members of the board mistreated him because of his race. This evidence may explain White's distrust and ostracization of Carter because she is white; it does not, however, make his treatment of her legal. That a black person has been racially discriminated against by some white persons working with him does not legally justify his racially discriminating against other white persons working with him. Title VII was specifically meant to combat such irrational lumping together of persons merely because of their race.

If the credible evidence reflected that Carter was a part of a scheme with the board to get rid of White because of his race, that Carter was unable or unwilling to work with White because of his race, or simply that Carter was not a good Head Start director, then White's treatment of her, including his refusal to accept the withdrawal of her resignation, might be justified and legitimate. There would be no irrational, racially discriminatory lumping together of persons. However, the credible evidence does not support this scenario.

### III.

■ As a victim of race discrimination, Carter is entitled to appropriate relief under Title VII. First, Carter seeks and is entitled under Title VII to backpay and other employment benefits she would have received had White and the agency not illegally terminated her employment. 42 U.S.C.A. § 2000e–5(g). The court will require that White and the agency pay Carter backpay and other employment benefits determined according to established legal principles. The parties will be given an opportunity to agree upon the amount of such relief.

■ Second, Carter seeks reinstatement as director of the Head Start Program. A person whose employment has been terminated because of race is presumptively entitled to reinstatement to his or her former position. 42 U.S.C.A. § 2000e–5(g). *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473 (11th Cir.1985). However, here the court is not persuaded that reinstatement would be appropriate because to reinstate Carter would require the displacement of an innocent person, Virginia Robinson, the present director of the program. *See Parker v. Wallace*, 596 F.Supp. 739, 746 (M.D.Ala.1984). The court will therefore require that the agency offer Carter another position with the agency, one for which she is qualified and which has a salary and responsibilities comparable to that of Head Start director.

However, if another, comparable position is not available, the court will require that, in lieu of reinstatement, White and the agency pay Carter frontpay determined according to established legal principles. *Nord v. United States Steel Corp., supra.* If frontpay is required, the parties will be given an opportunity to agree upon the amount of such relief. Of course, if either White and the agency or Carter can establish that the position of Head Start director or another, comparable position, though not available now, will become available soon, the court will order that, in lieu of frontpay in part, Carter is to receive the position when it becomes available.

■ Finally, Carter seeks and is entitled to attorney fees from White and the agency. 42 U.S.C.A. § 2000e–5(k). The court will require that White and the agency pay her such fees determined in accordance with the criteria established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *See also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) Judgment be and it is hereby entered in favor of plaintiff Mary Lee Carter and against defendant Harold C. White and defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc.;

(2) Defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc., be and it is hereby ENJOINED and RESTRAINED from failing, within 14 days from the date of this order, to offer plaintiff Carter another position in the agency for which she is qualified and which has responsibilities, salary, and other benefits comparable to those of director of the Head Start Program, if such comparable position is available;

(3) Plaintiff Carter be and she is hereby awarded from defendant White and defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc. all backpay and other employment benefits she would have received had her employment not been illegally terminated;

(4) All parties be and they are hereby allowed 14 days from the date of this order to file a request with the court to determine appropriate backpay and other benefits should the parties be unable to agree among themselves on the amount of backpay and other benefits to which plaintiff Carter is entitled;

(5) If another, comparable position is not available, plaintiff Carter be and she is hereby awarded frontpay from defendant White and defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc.;

(6) If another, comparable position is not available, all parties be and they are hereby allowed 14 days from the date of this order to file a request with the court to determine appropriate frontpay should the parties be unable to agree among themselves on the amount of frontpay to which plaintiff Carter is entitled;

(7) Plaintiff Carter be and she is hereby allowed 14 days from the date of this order to file a request for reasonable attorney fees, which request should address each of the criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); and

(8) All other relief sought by plaintiff Carter that is not specifically granted be and it is hereby denied.

It is the further ORDER of the court that all costs of these proceedings be and they are hereby taxed against defendant White and defendant Community Action Agency of Chambers, Tallapoosa and Coosa Counties, Inc., for which execution may issue.