Joseph M. MOGHADAM, Plaintiff,

v.

Okaloosa County Sheriff Charles W. MORRIS in his official capacity as Sheriff of Okaloosa County, Defendant.

No. 3:98CV383/RV.

United States District Court,
N.D. Florida,
Pensacola Division.

Feb. 23, 2000.

**1256**

Bradley Syfret Odom, Debra Dawn Cooper, Kievitt Kelly & Odom, Pensacola, FL, for plaintiff.

Linda Gail Bond, Powers Quaschnick Tischler, Tallahassee, FL, for defendant.

## ORDER

VINSON, Chief Judge.

Pending is the motion for summary judgment of defendant Okaloosa County Sheriff Charles W. Morris ["Morris"]. (doc. 36)

### I. *FACTUAL BACKGROUND*

This action for race and/or national origin discrimination is brought under Title 42, United States Code, Section 1981.[1] Except where noted, the following facts are not in dispute.

Plaintiff, who is of Iranian descent, is a certified law enforcement officer with certifications in various law enforcement fields. He was employed by the Okaloosa County Sheriffs Office as a part-time deputy under the administration of former Okaloosa County Sheriff, Larry Gilbert, from March 1996 through December 1996. Prior to being appointed, the plaintiff underwent a background investigation, and submitted to, and passed, a polygraph examination administered by Investigator Mark Young.

While working under Gilbert, plaintiff was assigned to the Crestview, Florida, office. Throughout the time of plaintiff's part-time employment as a deputy, he was employed full-time as a manager of a Popeye's Fried Chicken ["Popeye's"] restaurant in Crestview, Florida.

One of the plaintiff's co-workers, Deputy Fred Lithgow, testified that in mid–1996 he informed Lieutenant Paul Brown that he had previously worked with the plaintiff while the plaintiff was a volunteer (non-pay) reserve officer at the Pensacola Police Department in Pensacola, Florida, and that he had observed the plaintiff make

---

1. Throughout their pleadings, the parties continually intermix the concepts of "race" and "national origin" discrimination. While section 1981 allows a cause of action for discrimination based on race, it does not provide a basis for bringing a claim of discrimination based on national origin. *See Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). There is no

indication that the amendment to Section 1981 effected by the Civil Rights Act of 1991 [Pub.L. No. 102–166, 105 Stat. 1071 (1991) ] changed the scope of racial discrimination. Thus, I will treat the plaintiff's cause of action as based on race discrimination. Plaintiff Moghadam is a native of Iran and, as one born an Arab, may rely upon the racial discrimination protection of Section 1981. *Id.*

inappropriate comments to females while on duty. In addition to this complaint about the plaintiff, in June and July of 1996, four different Crestview deputies (Johnny Smith, Larry Ward, Jami Barrow, and Jason Adams) wrote memos to then-Sergeant Dale Griffith, complaining about the plaintiff's inability to find the location of calls to which he was dispatched while he was on patrol. In Smith's memo dated July 1, 1996, and Ward's memo dated June 27, 1996, the two recommended that the plaintiff be put back into the field training program because of his lack of familiarity with the area.

In Barrow's memo dated June 25, 1996, Barrow described a particular incident during which the plaintiff had difficulty finding a location to which he had been dispatched. In his memo, Barrow voiced frustration with plaintiff's inability to find such locations, even with directions. Barrow noted that serious problems could have arisen as a result of the plaintiff's inability to find locations if, for example, an officer had been depending upon the plaintiff for backup.

Adams' memo to Griffith, dated June 25, 1996, refers to another incident in which the plaintiff was dispatched to a location he could not find. According to the memo, the plaintiff drove around in circles for over 20 minutes, although he was eventually able to find the location. However, once the plaintiff got to the location, he had forgotten why he had been dispatched.

As a result of these complaints from the four deputies, Sgt. Griffith recommended to Captain Bill Welch that the plaintiff not be permitted to patrol on his own until he received additional training. Specifically, Griffith informed Welch in a memo dated June 25, 1996, that the plaintiff's "response time to calls is deplorable." Griffith also complained that the plaintiff was "constantly having to [ask] fellow officers how to fill out paperwork." Welch determined that the plaintiff needed retraining in order to learn the layout of the area in which he was employed. However, the plaintiff did not follow up with the re-training be-

cause, in September 1996, he apparently left his job as manager of the Popeye's Restaurant in Crestview. Plaintiff acknowledged during his deposition that he had problems with finding his way around Crestview, and that the public safety could have been jeopardized as a result.

Plaintiff testified that around the time that Captain Welch learned of the complaints, Welch went to the plaintiff and warned him "to watch his back" because there were some deputies who did not like him because of his nationality. Moghadam testified that Johnny Smith, one of the individuals who complained to Griffith, and who had helped train the plaintiff, called the plaintiff names such as "camel rider," and "Joe the Iranian." These comments were allegedly made on one occasion "in front of the public" at a Wal–Mart while the two were in uniform, and on multiple occasions at the Sheriff's Crestview station. In addition to Smith's alleged comment, plaintiff testified that Lithgow called the plaintiff a "sand nigger" in March 1997. Tony Jordan, who worked at the Pensacola Police Department from 1990 until 1996 testified that "numerous times" he had heard Lithgow refer to the plaintiff as a "sand nigger." Lithgow denies having made any racial slurs to the plaintiff.

After the 1996 elections, Sheriff Gilbert, who had been Sheriff of Okaloosa County for sixteen years, was replaced by Charles W. Morris on January 7, 1997. Pursuant to this change in sheriffs, the deputies and part-time deputies under Gilbert had to be reappointed and re-sworn under Morris before they could resume their law enforcement duties.

Morris' office was located in Shalimar, Florida. He appointed Steve Ashmore as captain of the Crestview office and gave Ashmore broad authority to recommend the appointment of deputy sheriffs for that office. In selecting whom to recommend, Ashmore reviewed the list of part-time deputies that had been assigned to the Crestview office under the prior administration for possible reappointment. Plain-

tiff, who was on the list, contacted Ashmore on several occasions about resuming his former duties.

According to Ashmore, while he was reviewing the list, several full-time deputies informed him that after the plaintiff had completed his field training, he was unable to find the location of calls to which he had been dispatched. Lithgow informed Ashmore that the plaintiff did not have "a good reputation among street level officers." Lithgow also stated that he had observed the plaintiff act unprofessionally toward women and that "there were complaints [about the plaintiff] being off his beat and going to down town [sic] bars to patrol or meet women." Lithgow also informed Ashmore that he had "heard rumors ... about [the plaintiff] chasing girls on [the Pensacola Junior College] campus while on duty [as a public safety officer for the junior college]," and that the plaintiff had been given the choice between resigning from that position or being terminated due to complaints "from females about Mohagodan [sic] trying to pick them up." Ashmore was also informed about rumors that the plaintiff had been terminated from his full-time job at Popeye's for sexual harassment.

As a result of hearing the rumors and complaints about the plaintiff, Ashmore reviewed the plaintiff's initial background screening under Sheriff Gilbert, and determined that the initial background check insufficiently detailed the plaintiff's prior law enforcement background. Accordingly, at a staff meeting, Ashmore requested a follow-up investigation to learn more about the plaintiff's law enforcement background and the rumors about the plaintiff's unprofessional conduct toward women. Ashmore informed the plaintiff that he would be conducting the background investigation before recommending his appointment to Morris. He also informed the plaintiff that while the investigation was pending, the plaintiff was on proba-

tion. Plaintiff conceded during his deposition that, under the circumstances, Ashmore acted responsibly by conducting the investigation. However, plaintiff testified that Ashmore led him to believe that he wanted Moghadam to remain with the Department, despite the plaintiff's problems with finding his way around the area.

Investigator Mark Young was assigned to conduct the background check. Young was not given any specific instruction on how to conduct the investigation. Young's investigation had two points of emphasis—to learn more about the plaintiff's law enforcement background, and to confirm or dispel the rumors about the plaintiff's alleged sexual harassment while the plaintiff was employed at Popeye's.

Young testified that in conducting his investigation of the plaintiff's law enforcement background, he read the 1996 letters from the deputies at the Crestview office, spoke with officers from the Pensacola Police Department, and spoke with Chief Richard Coffey. Coffey, who employed the plaintiff as a public safety officer while Coffey was Director of Public Safety at Pensacola Junior College[2], informed Young that he had given the plaintiff the opportunity to resign instead of being terminated from his public safety officer position, when he learned of complaints by females on the campus that the plaintiff "leered" at them, and asked some on dates. He also stated that he felt that he would be taking an "extreme risk" if he were to employ the plaintiff again because of his knowledge of the plaintiff's background. Coffey also testified that he had in the past advised the plaintiff to pursue a career other than law enforcement.

Young also learned during his investigation that the plaintiff was terminated by the Pensacola Police Department from a volunteer position as a result of the plaintiff's failure to complete the field training program. Lieutenant Gary Cutler, who

**2.** The plaintiff's job as a public safety officer at Pensacola Junior College was his only full-    time paid law enforcement position.

had responsibility over the reserve program and oversaw the plaintiff's training with the Pensacola Police Department, testified that he would not recommend the plaintiff for re-employment with the Pensacola Police Department. Officer Bradley Burrus of the Pensacola Police Department stated that the plaintiff had decision making problems, and "problems with officer safety."

Plaintiff stated that the reason he did not complete the field training was the time pressure from his other employment. Despite dropping out of the field training officer program, plaintiff remained with the Pensacola Police Department as a non-pay volunteer reserve officer until September 1995.

In order to investigate the allegations of sexual harassment relating to plaintiff's full-time position as a fast food restaurant manager, Young met with the owner and several employees of the Popeye's restaurant where the plaintiff had been employed. Young learned that the plaintiff had not been terminated for sexual harassment. Also, none of the employees interviewed by Young stated that they had any firsthand knowledge of sexually harassing or otherwise inappropriate conduct on the plaintiff's behalf. Moghadam denied that any sexual misconduct ever occurred.

At the conclusion of his investigation, Young wrote a report in which he concluded that plaintiff was a potential liability due to his history of inappropriate conduct toward females. He also stated that issues of officer safety and confidence were of "great concern." In addition, Young voiced concern over plaintiff's negative history with other law enforcement agencies. He concluded that the plaintiff was "not well suited for employment in law enforcement," and advised Ashmore not to recommend the reappointment of the plaintiff. Young testified that in creating the report,

he tried to fully and fairly present the substance of what those he interviewed had communicated to him.

Based on Young's report, and with Morris' approval, Ashmore informed plaintiff by letter dated March 7, 1997, that the defendant would not reappoint him as a part-time deputy sheriff. Morris testified that, while the plaintiff's performance for the Okaloosa County Sheriff's Department was not satisfactory, he would have decided not to reappoint the plaintiff based solely on the plaintiff's unsatisfactory past job performance with law enforcement agencies.[3]

Although it is unclear how plaintiff came to learn that Lithgow supplied negative information about the plaintiff, plaintiff testified that when he learned that Lithgow had supplied such information about him, he contacted Lithgow by telephone. This occurred in March 1997. According to the plaintiff, Lithgow informed him "you need to talk to Captain Ashmore, sand nigger," and then hung up the phone.

Plaintiff eventually met with Sheriff Morris to discuss his decision not to reappoint. Present at the meeting was undersheriff Cobb. It is unclear from the record which of these individuals spoke with the plaintiff, although plaintiff testified that one of them advised him that he was not being reappointed because he did not perform adequately in his previous law enforcement employment. The same person also advised the plaintiff to seek a law enforcement job with the sheriff's office within Santa Rosa County, where the plaintiff lived.

Plaintiff took that advice and sought out a law enforcement job in Santa Rosa County. He was not successful. After failing to secure employment with that office, the plaintiff unsuccessfully attempted to acquire employment with several other

---

**3.** In addition to the plaintiff, one other deputy, Willis Eastridge, a white male, had his appointment withdrawn by Morris. Ashmore testified that he had received complaints that Eastridge had attempted to get phone numbers from females while on duty, had gone to a female's workplace so frequently that she felt she was being harassed, and had conducted a traffic stop in his private vehicle.

Northwest Florida law enforcement offices. Plaintiff came to suspect that the reason for his difficulties was the report created by Young, so the plaintiff again sought to meet with Ashmore and Morris. After some unsuccessful attempts by the plaintiff to secure a meeting with Morris, the plaintiff was referred to Major Coup in November 1997. At the meeting with Coup, the plaintiff was given the opportunity to discuss Young's report and confront the allegations contained therein. During this meeting, plaintiff informed Coup of Lithgow's derogatory comment. As a result of the meeting, Coup decided to perform a third investigation.

Plaintiff stated that seven months later, Coup concluded his investigation and informed the plaintiff that he had been cleared of any allegations of sexual harassment. According to the plaintiff, Coup also said that he would contact the Florida Department of Law Enforcement so that they would "clear his file." Plaintiff testified that Coup later denied having made such statements. Coup did advise the plaintiff that the reason for his termination was going to be changed to failure to complete the field training officer course, and that prospective employers of the plaintiff would be informed of that reason if they chose to call Coup. Despite the change in the report, plaintiff was not offered reappointment with the Okaloosa County Sheriff's Department.

Unable to get the FDLE report corrected, plaintiff brought this action against Morris in his official capacity as Sheriff of Okaloosa County, alleging that he was discriminated against on the basis of his race and/or national origin. Defendant now moves for summary judgment.[4]

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." Cornelius v. Highland Lake, 880 F.2d 348, 351 (11th Cir.1989), cert. denied, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. See Souran v. Travelers Ins. Co., 982 F.2d 1497, 1502 (11th Cir.1993). Nevertheless, the non-moving party must provide more than a mere "scintilla" of evidence supporting his position, for if the evidence is merely colorable, or is not significantly

---

4. Plaintiff had also alleged in Count VI of the complaint that he was libeled. That count was voluntarily dismissed by the plaintiff.

See Order of Partial Dismissal, October 21, 1999. (Doc. 57)

probative, summary judgment may be granted. *Anderson, supra,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11, 91 L.Ed.2d at 212; *Johnson v. Fleet Finance, Inc.,* 4 F.3d 946, 949 (11th Cir.1993). Furthermore, although the non-moving party must designate "specific facts showing that there is a genuine issue for trial," the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Hargett v. Valley Fed. Sav. Bank,* 60 F.3d 754, 763 n. 9 (11th Cir.1995) (quoting *Celotex Corp., supra,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274, (1986)); *Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565, 1570 (11th Cir.1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (1986).

## B. *Discussion*

Defendant contends that he is entitled to summary judgment on the plaintiff's Section 1981 claim because: (1) the plaintiff was an at-will employee; (2) the decision to not reappoint the plaintiff did not result from a custom, policy, or practice of intentional discrimination; (3) plaintiff has failed to establish a prima facie case of discrimination; and (4) plaintiff has failed to produce any evidence that rebuts the defendant's proffered reason for not reappointing the plaintiff.

■ Subsection (a) of Title 42, United States Code, Section 1981 states:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 prohibits intentional race discrimination in the making and enforcement of contracts, including employment contracts. *See Ferrill v. Parker Group, Inc.,* 168 F.3d 468 (11th Cir.1999). "Section 1981 liability must be founded on purposeful discrimination." *Id.* at 472. However, "liability for intentional discrimination under section 1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus." *Id.* at 473. The test for intentional discrimination in actions brought under section 1981 is the same as the formulation used in Title VII discrimination cases. *See id.; Brown v. American Honda Motor Co. Inc.,* 939 F.2d 946, 949 (11th Cir.1991).

### (1) Section 1981 and the Requirement of a Contractual Relationship

Defendant first argues that because the plaintiff was an at-will employee, he did not have a contract on which he can base his claim under section 1981. The plaintiff neglected to respond to this argument.

■ My first task, therefore, is to determine whether the plaintiff had an employment contract for purposes of employment or re-employment. Under Florida law, a deputy sheriff is not an employee, even if he is full-time. *See Stough v. Gallagher,* 967 F.2d 1523 (11th Cir.1992) (holding that Florida deputy sheriff has no property interest in his position which would be cognizable under the Fourteenth Amendment.) The Supreme Court of Florida has stated:

The office of under or deputy sheriff is a common-law office; and this is the rule unless a change is effected by the constitution or statute law of the state. He holds an appointment, as distinguished from an employment.... [T]here is no relation as master and servant existing between the sheriff and his deputies.
*Murphy v. Mack,* 358 So.2d 822, 825 (1978).

Thus, it is evident that deputies, either full-time or part-time, do not have formal employment contracts for "property right"

purposes under Florida law. Moghadam must be considered an at-will employee.

■ The question, then, is whether section 1981 applies to an at-will employee. This issue has not been resolved by the Eleventh Circuit. *See Bishop v. Avera,* 177 F.3d 1233 (11th Cir.1999). There is widespread division among the courts. *See id.* at fn. 5. I note that the Thirteenth Amendment, and not the "property" prong of the due process clause of the Fourteenth Amendment, constitutes the basis of section 1981. Therefore, the use of the term "contracts" within section 1981 must refer to contracts in the general sense commonly recognized at common law. An at-will employee has such a contract, even if it is not a recognized property right for due process purposes, and even though he may be fired without cause. The terms and conditions of employment itself are part of that contract, and certainly the rate of pay, the hours of work, and such similar matters are agreed upon contractually. Thus, I conclude that section 1981 must apply to at-will employees.

For example, the Fifth Circuit has noted, "To hold that at-will employees have no right of action under section 1981 would effectively eviscerate the very protection that Congress expressly intended to install for minority employees...." *Fadeyi v. Planned Parenthood Assoc. of Lubbock,* 160 F.3d 1048, 1050 (5th Cir.1998)[5]; *see also Farrior v. H.J. Russell & Co.,* 45 F.Supp.2d 1358 (N.D.Ga.1999) (holding that "the on-going exchange of labor and pay [between employee and employer] represents their contract").

The argument could be made that even if section 1981 applies to at-will employment relationships, Florida deputies should not be covered under the statute because they are "appointees," not "employees." Still, the essence of the relationship is the "exchange of labor and pay," and therefore some sort of contractual relationship exists. This action falls within the purview of section 1981. Consequently, the defendant is not entitled to summary judgment on this ground.

**(2) Whether the decision not to reappoint the plaintiff resulted from a custom, policy, or practice of intentional discrimination.**

Defendant next contends that he is entitled to summary judgment because the plaintiff failed to produce evidence that the decision not to reappoint him was made pursuant to a custom, policy, or practice of intentional discrimination. Plaintiff has neglected to respond to defendant's arguments relating to custom, or practice— choosing instead to address solely the elements of plaintiff's prima facie case under Title VII. Plaintiff should be aware, however that "[a]n allegation of a Title VII violation cannot provide the sole basis for a section [1981 or] 1983 claim." *Arrington v. Cobb County,* 139 F.3d 865, 872 (11th Cir.1998).

In *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989), the Supreme Court held that section 1981 can provide no broader remedy against a state actor than can section 1983. Therefore, a plaintiff bringing such a claim must show an official custom or policy within the meaning of *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), just as a section 1983 plaintiff would have to do. *Id.; see also Brown v. Neumann,* 188 F.3d 1289, 1290 (11th Cir.1999). "A governmental entity is not liable under section 1983, merely as a matter of respondeat superior, for constitutional injuries inflicted by its employees." *Brown v. Neumann, supra,* 188 F.3d at 1290; *Jones v. Cannon,* 174 F.3d 1271, 1293 (11th Cir. 1999). Furthermore,

> only those officials who have final policymaking authority may render the munic-

---

5. The Fifth Circuit based its conclusion partly on the Supreme Court's implicit recognition of an at will employee's right to sue under Section 1981 in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

ipality liable under Section 1983. The mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review.

> *Brown v. Neumann, supra,* 188 F.3d at 1290 (internal citations omitted)

■ In order for the defendant to be held liable under the custom or practice prong of *Monell,* the plaintiff must demonstrate that a custom or practice of discrimination by the defendant is so well-settled and pervasive that it assumes the force of law. *See Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997); *Smith v. Chicago School Reform Bd. of Trustees,* 165 F.3d 1142 (7th Cir.1999). In other words, plaintiff must show a "persistent and widespread practice" of discrimination about which the defendant knew or of which practice the defendant had constructive knowledge, because "[n]ormally random acts or isolated incidents are insufficient to establish a custom. . . ." *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir.1994) (*quoting Depew v. City of St. Marys,* 787 F.2d 1496, 1499 (11th Cir. 1986)).

■ In this case, while some evidence suggests that random discriminatory comments may have been made about, or directed toward, the plaintiff on a few occasions, plaintiff has pointed to no evidence of a widespread policy or practice of discrimination, let alone any actual or constructive knowledge of such discrimination with respect to Morris (who is the final policymaker for purposes of section 1981 liability). Instead, the evidence indicates that plaintiff's non-reappointment resulted from legitimate, carefully considered decision making that in no way was based upon the plaintiff's race.

Plaintiff conceded that Ashmore acted appropriately by requesting the investigation after learning of the rumors about the plaintiff. Further, although plaintiff may feel that the failure to reappoint him after Young concluded his investigation was unfair, there is no evidence which may lead a reasonable factfinder to conclude that the decision resulted from a discriminatory motive on the part of Ashmore or Morris. Instead, in light of the undisputed evidence surrounding the plaintiff's past law enforcement experiences, and the other relevant information portrayed in Young's investigatory report, the decision not to reappoint the plaintiff was the only appropriate decision that could have been made. Thus, plaintiff has failed to point to a policy or practice of discrimination, and the defendant's motion for summary judgment must be granted on that basis.

**(3) The Disparate Treatment Discrimination Claim.**

■ Although it is unnecessary to address the merits of plaintiff's discrimination claim, I will do so for the sake of completeness. The elements of a disparate treatment claim of employment discrimination under section 1981 and Title VII are identical. *See Peterson v. BMI Refractories,* 132 F.3d 1405, 1412 n. 13 (11th Cir.1998); *Lincoln v. Bd. of Regents,* 697 F.2d 928, 935 n. 6 (11th Cir.1983).

It is undisputed that the plaintiff has established that: (1) he was a member of a protected class; and (2) he suffered an adverse employment action. However, defendant maintains that plaintiff cannot establish the remaining two elements—that he was qualified for the position and that others outside his class received more favorable treatment.

■ First, defendant contends that plaintiff has not shown that he was qualified for the position. The plaintiff himself concedes that he could not find his way to calls to which he had been dispatched. Moreover, plaintiff's previous attempts at employment in law enforcement had very negative results. The Pensacola Police Department officers responsible for Moghadam evaluated him as having problems with officer safety and decision making.

He would not be recommended for re-employment there. The plaintiff's supervisor at Pensacola Junior College had found Moghadam's performance to be so deficient as to warrant termination if he had not voluntarily resigned. He, too, would not rehire the plaintiff. Plaintiff points out that he was a certified law enforcement officer, and had worked in law enforcement for approximately four years, including several months with the Okaloosa County Sheriff's Office. But merely having a certificate from George Stone Vocational School is not enough for one to be a qualified law enforcement officer. He had, from the undisputed evidence, experienced serious deficiencies on the job with the Pensacola Police Department and Pensacola Junior College, as well as during his short stint with the defendant's department. Plaintiff has failed to establish that he was qualified for the position, despite drawing all reasonable inferences in his favor.

Second, defendant contends that plaintiff cannot identify a similarly situated person outside his protected class who engaged in similar conduct and received more favorable treatment. Plaintiff responds that he was the only known individual who had been subjected to a supplemental post-appointment background investigation. Although the record does contain evidence of another officer who faced similar circumstances as the plaintiff and was terminated, I will assume that plaintiff has satisfied this relatively light part of his *prima facie* case.

■ The burden then shifts to the defendant to proffer a legitimate, non-discriminatory reason for making the challenged employment decision. The undisputed evidence is that Ashmore requested the supplemental investigation in response to complaints by Okaloosa deputies about the plaintiff's work performance and the rumors about the plaintiff's improper sexual conduct and prior job problems. The supplemental investigation was requested only after Ashmore had reviewed plaintiff's initial background investigation and determined that it had not gone into sufficient depth regarding plaintiff's previous law enforcement experience. Then, after Investigator Young's investigation revealed that plaintiff had been dismissed from one law enforcement position and given the ultimatum of resigning or being terminated from his other prior law enforcement position, Ashmore determined that plaintiff should not be offered reappointment. Morris accepted Ashmore's recommendation.

Plaintiff argues that the proffered justification was pretextual, because Young was racially biased against the plaintiff and the plaintiff's non-reappointment resulted from a false investigatory report. However, there is simply no evidence which suggests that Young was in any way biased against the plaintiff, or that any information contained in his report was inaccurate. Plaintiff argues that "the record demonstrates that a multitude of the declarants who were interviewed by Investigator Young say that they never said what Young says they said." However, plaintiff has failed to accurately identify a single specific instance involving such a discrepancy, and after carefully reviewing the record, I have found nothing to support the plaintiff's contention. There is simply no objective evidence of any pretext.

■ Even assuming that plaintiff had shown evidence which suggests that some of the information in the report was somehow false, there is nothing in evidence to indicate that Morris should not have accepted the report as reliable. Section 1981 does not allow liability merely as a matter of *respondeat superior. Brown v. Neumann, supra,* 188 F.3d at 1290; *Jones v. Cannon,* 174 F.3d 1271, 1293 (11th Cir. 1999). Instead, plaintiff must point to some evidence that Morris was actually or constructively aware that the investigative report was the product of discriminatory animus, or that the decision to not reappoint the plaintiff was somehow based on

an unlawful motive. There is simply no evidence in the record that suggests any bias whatsoever on the part of Ashmore or Morris. In fact, plaintiff concedes that he does not believe that either of these individuals was biased against him. Moreover, there is no dispute about plaintiff's previous termination from the Pensacola Police Department, and the circumstances under which he left his position at Pensacola Junior College. Morris testified that these instances alone were enough to have him make the decision to not reappoint the plaintiff.

At best, plaintiff has produced evidence that one or two deputies may have harbored some racial prejudice toward him. Such evidence is insufficient to support a section 1981 claim.

### III. *CONCLUSION*

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED. (Doc. 36) The Clerk shall enter judgment for the defendant, together with taxable costs.